## STATE V. SUMNER.

(Filed June 10, 1902.)

1. HOMICIDE—*Evidence—Character of Deceased as a Violent and Dangerous Man—Particular Character.*

In an indictment for murder, there being evidence tending to show that the killing may have been done from a principle of self-preservation, it is competent to show the general reputation of the deceased for a *particular* character for violence, if such character was known to the defendants.

2. HOMICIDE—*Evidence—Character.*

In an indictment for murder it is not competent to show that the deceased had difficulties with other persons than the prisoner.

INDICTMENT against Zeb. Sumner, heard by Judge *Thos. J. Shaw* and a jury, at April Term, 1901, of the Superior Court of MACON County. From a verdict of guilty of manslaughter and judgment thereon, the defendant appealed.

*Robert D. Gilmer,* Attorney-General, for the State.
*Shepherd & Shepherd,* for the defendant.

COOK, J. Prisoner was indicted for the murder of one
Ledbetter and convicted of manslaughter and sentenced to
serve a term of five years in the Penitentiary. The uncon-
tradicted evidence shows that deceased was a man of danger-
ous, violent, bad character, especially when drinking, and that
he was drinking on the day of the homicide. That upon four
occasions previous to the day of the homicide deceased, without
apparent provocation, violently abused and cursed prisoner
and sought to provoke a difficulty with him. Upon the day
of the homicide deceased cursed and abused prisoner in the
court-house and followed him, with a knife up his sleeve, to
the Clerk's office, and thence to the Register's office, and
thence out of the court-house as far as Trotter's store, when
prisoner stopped, for fear of being cut in the back, and
warned deceased to go away, when deceased remained cursing
prisoner, calling him a damn coward, and using other insult-
ing language, when the town Marshal came along, and pris-
oner said to him, "I make charge against him (meaning de-
ceased) for being drunk and disorderly; take him and lock
him up. He has followed me all day and I don't want to
hurt him." Deceased said to the Marshal, "God damn you,
I would like to see you arrest me." The Marshal said he
"did not see that either had done anything to be arrested for,"
so he did not interfere. But deceased's brother came up and
carried him away. One bystander said to prisoner, "I would
kill a man that would treat me that way," to which prisoner
replied, "By the time you have been locked up for murder,
you would decide that it is best not to kill a man." Shortly
thereafter prisoner armed himself and went up the street at-
tending to some business, and while standing upon the street,
as prisoner testified, one Palmer said, "George (meaning de-

ceased) has been cursing and abusing you again.     *     *     *
There comes George again," and George (deceased) came up
and said, "You say you have nothing against me?" and pris-
oner said, "George, I have told you this time and again that I
have nothing against you," and deceased said, "Well, give me
your hand." Prisoner extended his hand towards him, and
deceased dropped his hand and said, "No, by God, we will go
to the court-house and talk this thing over." After some
other words deceased stepped one foot back and put his hand
back, as it appeared, in his right hip pocket and pushed his
left hand down in his left pocket, and being standing "right
up against me," prisoner drew one pistol and opened fire upon
him, firing four shots in rapid succession, when deceased
walked off in a staggering way, and, looking back at prisoner,
with his hands near or about his hip pockets, while about ten
or fifteen steps away, prisoner drew another pistol and fired
twice, inflicting the mortal wounds with a 44 pistol, at which
time, prisoner testified, deceased was trying to draw a pistol,
which he saw (and which was afterwards found in his
pocket). Prisoner testified that he had been told by every-
body about deceased's character as a dangerous and violent
man, and had been warned that he would walk up to a man
and ask him for his right hand and stick a knife in him with
his left hand; and he had been informed that he had cut Lee
Allman that way, and had cut Chas. McGee's son that way,
and that he had mistreated James Potts and tried to take ad-
vantage of him and kill him. There were several witnesses
who testified that they had heard deceased threaten to kill
prisoner, and that some of these threats had been communi-
cated to him before the homicide. Some of defendant's wit-
nesses testified that, during the firing of all the shots, deceased
was endeavoring to draw his pistol. Some of the State's wit-
nesses testified that they did not see him attempt to draw his
pistol, or have his hand in or at his hip pocket, but that his

hand was on the outside of his coat on his hip or side—some saying one way, some another.

Prisoner offered to prove by Potts, Ed. McGee and Chas. McGee, certain individual difficulties the deceased had with them, which was properly excluded upon objection by the State. Prisoner offered to prove by Potts and Ed. McGee that deceased had "the reputation of being a man who would take the advantage of another, representing himself to be his friend and get the advantage of him and do him some bodily harm, making out at the time that he was his friend," which was, upon objection by the State, excluded, to which prisoner excepted.   This raises the question whether it is competent to show a general reputation for any particular character for violence, and if so, was it material to the issue joined by the plea of not guilty?

The rule is that "evidence of the general character of the deceased, as a *violent* and *dangerous man,* is admissible where there is *evidence tending to show that the killing may have been done from a principle of self-preservation,* and also where the evidence is wholly circumstantial, and the character of the transaction is in doubt."   *State v. Turpin,* 77 N. C., 473, 24 Am. Rep., 455; *State v. McIver,* 125 N. C., 645. This rule varies from the general rule as to proving general character in that it permits certain particular traits of character to be shown.   The reputed character of deceased may be evidential as indicating the prisoner's reasonable apprehension of an attack, for in a quarrel his violent or turbulent character, as known to the accused, may give to his conduct a significance of hostility which would be wanting in the case of a man of ordinary disposition.   1 Greenleaf Ev., Sec. 14c. In *State v. McIver,* 125 N. C., 645, the Court held it to be competent to show that deceased was a man of "vicious temper and violent when he got angry," thus particularizing his peculiar trait and condition under which he became vio-

lent. The principle upon which the admission of this kind of evidence is based is to show to the jury the reasonableness of the apprehension upon which the accused acted. It is admissible to explain and excuse the use of violence ordinarily inexcusable. Under some circumstances, violence used upon a peaceable, quiet man, though of generally bad character, would be inexcusable, while under the same circumstances, if used upon a man of generally good character, though bad for violence under certain conditions (such as when under the influence of liquor, etc.), would be excusable. A man may have a bad character generally, but good in some particulars, such as for truth, or generally bad, but good for peace, sobriety and industry. A man may have a character bad for some kinds of violence, while not bad for other kinds. So the principle upon which the character of the deceased is admissible, in a case of homicide, is to show that the accused had reason to apprehend danger or violence from deceased, which apprehension would be excited by the particular conditions under which deceased was reputed to be dangerous and violent. If bad only when drinking, then no apprehension would exist when he would be sober; if bad for using a knife, then no apprehension would exist when out of reach.

In the case at bar, the prisoner testified that he had "been told by everybody about deceased's character as a dangerous and violent man, and had been warned that he would walk up to a man and ask him for his right hand and stick a knife in him with his left hand." And he also testified that, upon the occasion of the homicide, deceased said to him, "Well, give me your hand." Now, then, if such were his general character, and knowing of his threats, why should not the prisoner, under such conditions, have then and there apprehended serious danger? and upon an overt act of aggression, such as putting his hand in his pocket or upon his hips, and having such apprehension, should he have waited longer and taken

the risk of the danger he might reasonably have apprehended would follow? But his reputation, if such he had for this particular kind or practice of violence, or this particular trick in executing violence, was excluded from the jury, and they were not informed of such, if such existed. If such were the reputation of deceased, then the apprehension of prisoner would have been naturally excited, and, upon evidence of aggression by deceased, prisoner would have understood what it meant and defend himself accordingly. But the evidence having been excluded, the jury could not intelligently judge as to the reasonableness of such apprehension upon which prisoner acted, and upon this his fate depended. The verdict was to be based upon what the jury would think reasonable, and not what the prisoner thought, and not being furnished with this evidence they could not interpret his conduct in the light of the situation as he actually saw it. Therefore, this evidence was material to explain his sudden and extreme violence when deceased "stepped one foot back" under those circumstances.

Prisoner had testified that deceased did have such general character, and he had been warned of it. Then, it was competent for him to show that such existed, for it may be that his apprehension was founded upon it, and of that the jury should say whether it was or was not reasonably founded. For the error in excluding this testimony, a new trial must be granted. There are several exceptions taken to the charge, but we deem it unnecessary to pass upon them.

New Trial.