STATE *v.* CASTLE.

STATE v. CASTLE.

(Filed December 19, 1903.)

1. EVIDENCE—*Homicide.*

In a prosecution for murder, evidence that the accused, who was a foreman of a lumber camp, had not sent the deceased sufficient dinner on the day of the killing, is irrelevant.

2. CHARACTER (IN EVIDENCE)—*Evidence.*

In a prosecution for murder, evidence that the defendant drank liquor is not admissible, as the character of the defendant was not in evidence, he not being a witness and his character not being provable by particular facts or conduct.

3. HOMICIDE—*Self-defense—Instructions.*

Where, on a prosecution for murder, the court charged that defendant was justified in meeting force with force, it was error to add, "But you are to judge of the force necessary, and not the prisoner," since the jury should merely find whether he did more than a reasonable man should have done.

133—49

4. HOMICIDE—*Self-defense.*

On a prosecution for murder, it was error to charge that it was incumbent on defendant to first use gentle and mild means, and that if he used more force than was necessary and the deceased could have been ejected without it, he would be guilty of murder in the second degree, since the instruction made the right of self-defense turn on the necessity for the force used, without reference to whether it reasonably appeared necessary.

5. HOMICIDE—*Murder—Instructions.*

On a prosecution for murder it was error to instruct that if the provocation were great the crime would be but manslaughter, but if slight, and the killing done out of proportion to the provocation it would be murder in the second degree, there being no slight provocation in evidence.

6. HOMICIDE—*Instructions.*

In a prosecution for murder it was error to charge that if defendants went to the room of deceased to discharge them and they entered into a sudden quarrel and killed the deceased men they would be guilty of manslaughter, there being no evidence of a sudden quarrel.

7. HOMICIDE—*Self-defense—Evidence—Burden of Proof.*

In a prosecution for murder, the defense being self-defense, an instruction that the burden is on the defendant to show facts necessary to excuse or mitigate the homicide and that the same must be to the satisfaction of the jury is erroneous, as the defendant is entitled to rely on the evidence of state, if any, to mitigate or excuse the homicide.

INDICTMENT against J. E. Castle and W. E. Garland, heard by Judge *E. B. Jones* and a jury, at April Term, 1903, of the Superior Court of BURKE County. From a verdict of guilty of murder in the second degree and judgment thereon the defendants appealed.

*Robert D. Gilmer, Attorney-General,* for the State.

*A. C. Avery, S. J. Ervin* and *Edmund Jones,* for the de-
fendants.

CONNOR, J. The defendants were convicted of murder in
the second degree and from a judgment upon the verdict ap-
pealed to this Court.

The testimony tended to show that the defendant Castle was
in charge as local manager of a lumber camp constructed
and operated by the William Ritter Lumber Company at the
terminus of its railway at Camp Creek in Burke County;
that he had charge of the railway and all of the incidental
work, including a boarding-house, where the hands ate and
slept and in which the homicide occurred. At the time of
the homicide there were more than sixty or seventy men in
the camp. Forty or fifty of them slept in the main building.
They took their supper and breakfast in a hall called the
dining-room. There was another room, called the lobby,
which was used by the hands as a public sitting-room. The
board of the hands was furnished by the lumber company
under the supervision and direction of the defendant Castle.
The deceased men, Dockery and Fortner, were employed by
the lumber company.

John Roberts, a witness for the State, testified that they
quit work in the evening at six o'clock; that Dockery stopped
at twelve and went into camp. Supper was served about
seven o'clock. The camp was in charge of the defendant
Castle. Two colored men did the cooking. The sleeping
apartments were upstairs. The lower part of the main build-
ing was used as a dining-room and a part of it as a lobby.
There was a hall upstairs and bed-rooms on either side. The
defendant Castle discharged hands for disorder. Each "boss"
was held responsible for his hands and had the power to dis-
charge them. The witness had some talk with Castle about

not having dinner that day. He asked who was drinking at the camp, and the witness told him the Fortner boys and Dockery were drinking some. There was a rule that no drinking should be allowed in camp. The witness, under objection, was permitted to say that Castle drank himself, to which the defendant excepted. It was further in evidence that dinner was sent to the hands in the woods, being prepared by the cooks, and that the hands were charged by Castle for the company a stipulated price per meal for their dinner sent them, which was "docked out" of the daily wages of the men. The State proposed to show by John Roberts that sufficient dinner was not sent to his hands on the day of the homicide. The defendant objected; the objection was overruled,. and the defendant excepted.

C. H. Buchanan testified that the deceased were drinking before and after supper; that he heard no hollering by them out on the porch, but could hear them cursing all over the lobby, and heard shooting once or twice upstairs. A day or two afterwards he saw where one ball went through the floor of Dockery and Fortner's room into the lobby; heard them cursing about the time they came into supper, using profane and indecent language. They were making a noise, and Castle asked them several times to stop. Castle got the time of the deceased men from Roberts; said he did not see why the boys wanted to do that way; that they could get their money without doing that way; that when Garland came he asked Castle where the boys were and Castle said "upstairs." Castle asked Garland what were Mortimer's orders. Garland said Mortimer's orders were to write out discharges and tell them to go away; said send them away quietly, to deputize all of the men he wanted. Castle asked Garland who would be good men, and he named several. Garland was in the employment of the lumber company. The defendants went to the room of the deceased. Castle had a lantern in his left

hand and an envelope in his right hand. All went upstairs; went into Dockery and Fortner's room. Castle, Garland and Lunsford walked in. Castle walked in first on the right side, then Garland walked in on the left side. Castle handed Dockery an envelope and said: "Here, boys, is your time." Dockery said something; never understood what he said; all stood up. Fortner was sitting on the left of the bed as we went in. Dockery had a knife in his hand—hawk-bill. Fortner had a pistol in his right hand, sitting on the bed with his feet hanging down, holding the pistol with the muzzle towards the door, and as Garland stepped in Fortner turned his pistol up by turning over his hand. Garland grabbed at the pistol and said: "What are you going to do with that pistol?" Fortner arose and grabbed the pistol with both hands, and they entered into a scuffle with the pistol. As Garland took hold of the pistol he raised up. Dockery raised up with his knife and struck at Garland two strokes. Fortner and Garland were struggling over the pistol. The witness thought he cut Garland.

Stokes Pendland testified that he was commissary clerk and was at the camp on the night of the homicide; that Dockery came in about three o'clock and said he quit because they gave or sent out no dinner. The witness asked him if he wanted him to go up to the lobby and have some dinner cooked, and he said he did not want any dinner at that time. He and Riddle went out and took a drink of liquor. Dockery came back and asked the witness to show him a knife. The witness went and got out knives, and he bought one. He said he had not had any dinner, and if Castle charged him with three meals he would kill him at supper. He repeatedly made those threats. In the evening, up to supper time, he was drinking considerably, and said he had two kinds of liquor. He bought a hawk-bill knife and said that was the kind he wanted; that he had used a knife like that before. That

evening about five o'clock the witness went to Riddle and asked him to talk to Dockery and try to get him quiet. He said that Dockery said all he wanted was his money. The witness told him if that was it he would phone Mortimer and see that he got his money. After this conversation Castle came where the witness was. The witness told Castle that he was going to have some trouble, and related the threats that Dockery had said he would kill him if he charged him for three meals. The witness went to supper and warned Castle as to the threats. The gong rang and they started into supper. He saw Fortner; he and Dockery were cursing and using some tough language. We sat down to the table. There were between fifty and sixty of us. Castle asked the boys to keep quiet. After he called the roll he went back into his office. Dockery kept on using the language until all had gone out except a few of us. His language was very vulgar. The witness went back to the commissary; met Fortner and Dockery in the hall. They were taking a drink of whiskey. One of them said: "We have got the whole damned thing bluffed"; think it was Dockery. The witness said: "Boys, if you have got the thing bluffed, I would go up and go to bed." That was the last the witness saw of them. They were shooting and making all sorts of noise upstairs, like knocking over things. The conduct of the deceased men was such as to make the hands leave, and they said if it was such as to be overlooked they would leave.

J. W. Staney testified that he was at supper and heard the deceased use the language stated by other witnesses. He left because of the language they used. He heard a noise upstairs. They came downstairs. Their language was very vulgar.

Zeb Huskins testified that he saw the deceased in the hallway going towards their room. Dockery had a knife and Fortner had a pistol. Fortner said: "I thought you were

that —— John Castle." Dockery caught me by the shoulder and pulled me into the room, and asked me if I had seen anything of that —— Castle; he said if he could see the —— that night, this would do the work for him. He then jumped off the bed and shot down through the floor. Dockery said if he could see the —— he would cut him to death; he said that he had cut one to death and they penned him for that; he said he was going to cut another —— if he could see John Castle that night, and if they penned him for that he was going to quit.

There was much other testimony of the same character. The testimony in regard to the homicide, as gathered from the several witnesses, is substantially as follows: The defendants, together with several others, went to the room of the deceased for the purpose of giving them their time and discharging them. Fortner, with a pistol in his right hand, started to raise up off the bed, and cursed them. Garland grabbed the pistol with his left hand. Fortner raised up straight, so did Dockery, with a knife in his hand, Fortner trying to shoot. Garland was holding the pistol. Castle pulled out his revolver. Dockery made a cut at Garland with his knife, and as he did so Castle shot Fortner. He shot him twice. As he turned Dockery had his knife drawn facing Castle, his arm drawn in a cutting position. Castle shot him twice.

The first exception relates to the testimony of John Roberts that sufficient dinner was not sent to his hands on the day of the homicide. This testimony was clearly irrelevant and was calculated to prejudice the defendant Castle, it being his duty to have dinner sent to the hands, for which, under his direction, they were to be charged on the books of the company, to be deducted from their wages. To charge that he did not send proper dinner or a sufficient quantity of dinner

was calculated to prejudice the jury against him, and should not have been admitted.

The second exception is directed to the testimony that Castle drank liquor. It is not suggested that he was drunk on the night of the homicide. If the purpose of the testimony was to attack his character, and we do not see how it could have been admitted for any other purpose, it was incompetent. He did not put his character in evidence, and certainly the State could not introduce evidence for that purpose upon the question of his guilt. When he went upon the stand he put his general character in issue as a witness, and the State might have proved that such character was not good. It could not, however, introduce evidence of particular facts or conduct on his part. It is well settled that for the purpose of attacking general character the party seeking to do so can only prove common report or reputation. *State v. Laxton,* 76 N. C., 216; *State v. Boswell,* 13 N. C., 209; *State v. Bullard,* 100 N. C., 486; *State v. Horne,* 107 N. C., 810.

"The defendants asked the Court to charge the jury that if when Castle approached the deceased and handed one of them his time and gave notice of discharge they immediately drew deadly weapons and used threatening language or attempted to make a deadly assault on Castle or Garland, who accompanied him, Castle was justified in meeting force with force necessary to protect himself and companion from bodily harm; that if Castle was where he had a right to be, or it was his duty to be, he was not required by the law to retreat to the wall from a deadly assault, though he stepped back when Dockery had drawn a knife within reach of him, and was impeded so he could not get out of Dockery's reach by John Lunsford, he did retreat to the wall."

The Court gave these instructions, adding to each of them the words: "But you are to judge of the force necessary, and not the prisoner," to which the defendants excepted.

STATE *v.* CASTLE.

We think that the prayers as asked were correct propositions of law in the light of the testimony, and that the Court below should not have added the words complained of. While it is undoubtedly true that the jury are the judges of the force which reasonably appeared necessary to be used to repel the assault, or, to put it more accurately, they are to put themselves in the place of the prisoner and say whether or not, from the testimony the force used was such as a reasonable man under like circumstances would have used, yet it is not correct to leave the guilt or innocence of the defendants to depend upon the absolute necessity of the force used. "Where one is drawn into a combat of this nature by the very instinct and constitution of his being, he is obliged to estimate the danger in which he has been placed, and the kind and degree of resistance necessary to his defense. To do this he must consider not only the size and strength of his foe, how he is armed, and his threats, but also his character as a violent and dangerous man. It is sound sense, and we think sound law, that before a jury shall be required to say whether the defendant did anything more than a reasonable man should have done under the circumstances, it should, as far as can be, be placed in the defendant's situation, surrounded with the same appearances of danger, with the same degree of knowledge of the deceased's probable purpose which the defendant possessed. * * * The jury must ascertain the true character of the combat; for if from the nature of the attack there was reasonable ground to believe there was a design to destroy his life or commit a felony upon his person, the killing the assailant would be excusable homicide." *State v. Turpin,* 77 N. C., 477, 24 Am. Rep., 455.

The Court charged the jury: "Yet it was incumbent upon him to use first *gentle* and mild means, and if he and those with him used more force than was necessary, or unreasonable or violent force, such as deadly weapons, and you find they

could have been ejected without such violent force, the defendants would be guilty of murder in the second degree." To this instruction the defendants excepted. The defect in this instruction consists in the fact that the Judge makes the right of self-defense to turn upon the necessity for the force used, without reference to the question whether it reasonably appeared to be necessary to use such force as the defendants resorted to. The right of self-defense depends upon the use of such force as is necessary, or reasonably appears to be necessary, whereas his Honor directed the jury to consider only the question of necessity. We think there is also error in this instruction, because, taking all of the testimony to be true, the doctrine of *molitier manus* does not apply. The defendant Castle had a right to go into the room for the purpose of giving them their time and notifying them of their discharge. All of the testimony shows that as he entered the room these men were armed with deadly weapons, and immediately upon his entering the room the difficulty began. There is no phase of the testimony which tended to show that the defendants could have resorted to gentle and mild means in performing their mission.

His Honor further instructed the jury: "If the provocation be great it will be but manslaughter, but if the provocation be but slight and the killing be done out of all proportion to the provocation it will be murder in the second degree." The error in this instruction consists in assuming that the jury could find that there was slight provocation. If the jury found that there was any provocation it consisted in a deadly assault by the deceased upon the defendants, and it would be difficult to conceive how the jury, in the light of all the evidence, could find that the means used by the defendants was "out of all proportion to the provocation."

He again charged the jury: "If the defendants went to the room of the deceased for the purpose of discharging them, and

not for the purpose of conflict or fight, and they entered into a sudden quarrel and fight and killed Dockery and Fortner, they would be guilty of manslaughter." There is no evidence in this case that the defendants entered into a sudden quarrel with the deceased. Assuming that the jury did find that the defendants went to the room of the deceased for the purpose of discharging them, which was entirely lawful, and not for the purpose of having a conflict or fight, there was no word used from which the jury could infer a sudden quarrel. The testimony tended to show that one of the deceased had a pistol and the other a hawk-bill knife; that when Garland undertook to disarm Fortner of his pistol Dockery attempted to use his knife upon Garland or Castle, while Garland was struggling with Fortner. With these conditions surrounding them, we can see no theory upon which the defendants can be guilty of manslaughter. If the jury found that they went there for a lawful purpose, and in the prosecution of such purpose they were suddenly assaulted in the manner testified to by the witnesses, and they used such force as was or reasonably appeared to them to be necessary, the jury taking into consideration the character of the deceased, the frame of mind in which they had been and were at the time, the threats of one of them, and all the other testimony, we think the defendants were entitled to an instruction that it was excusable homicide.

Of course if the jury should find that the defendants Castle and Garland went there for the purpose of provoking a difficulty, and not for the *bona fide* purpose of discharging their duty, and in the prosecution of such purpose they killed the deceased, they would be guilty of manslaughter at least, and if the jury should further find that the deceased made no assault upon them they would be guilty of murder at least in the second degree.

The defendants further except to his Honor's charge for

that he repeatedly said to the jury that the burden was upon them to prove to their satisfaction the existence of the facts necessary to reduce the grade of the offense or to mitigate or excuse the homicide.    Undoubtedly the general rule as stated by his Honor is correct, but we think that he should have gone further and said to the jury that if the facts and circumstances accompanying the homicide were given in evidence by the State's witnesses the defendants were not called upon to introduce other testimony, but could rely upon the State's evidence for mitigation of the grade of the homicide or for an acquittal.    *State v. Willis,* 63 N. C., 26.

His Honor said to the jury in conclusion: "But it is incumbent upon the defendants to satisfy you that these circumstances and state of facts have been shown to your satisfaction."    We think that this was calculated to leave the impression upon the minds of the jury that the defendants were required to introduce independent evidence to mitigate or excuse the homicide.    As we have seen, if there was any evidence in the State's testimony which tended to establish the defense it was the duty of the jury to consider it as tending to sustain the plea of self-defense.

The testimony in this case shows a course of conduct on the part of the deceased which placed the defendant Castle, with the responsibilities resting upon him and his duties not only to his employer but to the large number of men under his charge, in an exceedingly embarrassing position.    He was in charge of a lumber camp of some fifty or sixty men. It was absolutely necessary to a discharge of his duty both to his employer and the men that such conduct, as is testified to by the State's witnesses, on the part of the deceased should be suppressed, and that persons conducting themselves as did the deceased should be discharged, and if the jury found, and we think they would have been fully justified in finding, that he was endeavoring to discharge his duty, and in doing

so the conduct of the deceased was such as to create in his mind a reasonable apprehension that they would execute their threats and continue in their course of conduct, he was not only justified but it was his duty to use such means as were necessary to rid the camp of such persons. It certainly was his duty to discharge them, and to do so promptly he had a right to go to their room for that purpose, and in view of what had occurred and the conduct of the deceased in the dining-room and after they had gone to their room, it was but common prudence for him to carry a sufficient number of men to prevent or repress any further violence. His language upon entering the room, "Boys, here is your time," is entirely consistent with the lawful purpose on his part. In the deadly encounter which immediately followed, and in which the homicide was committed, we think that the defendants were entitled to the instructions asked by their counsel, and that the modification of them was calculated to prejudice them. Upon the whole record we think the defendants are entitled to a

New trial.