## STATE v. WALTER GADDY.

### (Filed 29 April, 1914.)

**1. Homicide — Assault — Defense of Mother—Justification—Deadly Weapon—Superior Strength.**

Upon trial of the prisoner for homicide of his brother, justification was relied upon as a defense, and there was evidence tending to show that the defendant was physically deformed and the deceased was a man much stronger and of a dangerous character, who had assaulted their mother, had knocked the prisoner down when he attempted to interfere, and received the deadly cut from a knife the prisoner used while he was being held down. *Held,* that the prisoner was only permitted to use such force as the mother could have reasonably used in her own defense to repel the assault, and that the court properly charged the jury that they, in passing upon this question in relation to the personal assault made on the prisoner, should consider, under the circumstances, the relative size, strength, and position of the deceased and the prisoner, and determine whether the prisoner apprehended or had reasonable grounds to apprehend, at the time, either that he was in danger of losing his life or receiving great bodily harm.

**2. Homicide—Assault—Justification—Apprehension of Harm—Without Fault.**

Where one, unprovoked, assaulted another, when he was at a place he had a right to be and doing what he had a right to do, the person assaulted may stand his ground and use such force in repelling the assault as may reasonably lead him to believe, and which he does believe, necessary to prevent his being killed or receiving serious bodily harm at the hands of the assailant, to the extent of taking his life; and the charge in this case, that the prisoner must have been "without fault" in provoking the assault, is held to be a correct statement of the law arising from the evidence.

**3. Same — Trials — Instructions — Burden of Proof—Questions for Jury.**

Upon a trial for murder wherein it appears that the prisoner killed the deceased with a deadly weapon while the latter was making an assault upon him unarmed, but that the deceased was of greatly superior strength and a dangerous character, matter in justification may be shown by the prisoner, both from his own and the State's evidence, that, under the circumstances, he killed his assailant with reasonable apprehension that it was

necessary to do so either to save his own life or to keep himself from great bodily harm, though ordinarily the use of a deadly weapon would not be required, the question as to the degree of force the prisoner could use in his self-defense, and how the evidence should be considered, being for the jury under correct instructions from the court, the burden of proof being on the prisoner to show matters in mitigation to reduce the offense from murder in the second degree.

APPEAL by defendant from *Lane, J.,* at October Term, 1913, of UNION.

The defendant was indicted for the murder of Will Gaddy on 29 July, 1913. There was a verdict of manslaughter, on which the defendant was sentenced to two years upon the roads, and he appealed from the judgment.

The evidence for the State tends to show that on 29 July, 1913, the deceased was killed by the prisoner, his brother, during a fight in which the prisoner cut the deceased several (seven) times, once in the jugular vein.

The evidence for the State is contained in the testimony of Mrs. Mollie Gaddy, widow of the deceased. She said: "I live 3 miles this side of Peachland, in Anson County. I do not know hardly how near the county line. Will Gaddy was my husband; he was a brother of Walter Gaddy. I don't know hardly how far Walter lived from us; about 300 yards. His brother, Charlie Gaddy, lived with us. Walter Gaddy lived with his mother. My husband is dead. I was present when my husband was killed. Clyde Gaddy came up to my house that day, and I asked Clyde if he had seen Will. He said, 'He is down home.' I went down to Walter Gaddy's and found there Walter Gaddy and his mother, and Charlie and Clyde Gaddy. My husband was laying a gun up in the rack when I got there. I asked him what did he mean, and he said, 'You go home and mind your business.' At that time Walter said, 'Let's all go up home to your house.' We all started—Miss Dollie, Mrs. Gaddy, Walter, Charlie, and Clyde, and Will, my husband—up to our house. Before we got there, my husband took hold of his mother around the neck, sort of. Walter told him to turn her loose, and my husband sort of shoved him back. Walter pulled out his knife, and my husband told him to put his knife back in his

STATE *v.* GADDY.

pocket, and about that time Walter commenced cutting my husband. He cut him six or seven times, as far as I know. They were in the road when he commenced cutting. When he quit cutting him they were in the field about three steps, I reckon. Walter was in front and my husband back out in the field; Walter was cutting him then. My husband did not have any weapon in his hand. When Walter was cutting, my husband was knocking off the licks, or trying to. Walter hit him with a rock, too. My husband had fallen down; he was down in the field when he hit him with the rock. He hit him in the face. It was a rock about the size of my fists. My husband got up and started to throw a rock at him, but he could not throw; and the rock rolled by Walter's feet. My husband fell over and Walter hit him with another rock. My husband got up and said, 'Walter, I will go to the house and get my pistol.' He started and got about thirty steps and fell, and died about half an hour afterward. He did not talk any more after he fell. He had no weapon at all except when he picked up that rock. I don't know what took place at the house before I went down there. My husband was cut here (indicating the neck), on the left side and on the back. There were seven cuts in all on his body. The knife Walter had was a common pocket knife, as far as I know. My husband never spoke while Walter was cutting him. Charlie, he ran up about the last of it. Charlie got cut in the hand. My husband fell twice; he picked up the rock the last time. He did not hit Walter with the rock."

The evidence for the defendant tended to prove that on the evening of 29 July the deceased, either drunk or angry, approached his mother's house. Before he reached the house, he came to his little brother Clyde, aged 12, and his sister Dollie, aged about 15, who were at work in the field near the house. He cursed them and bade them lay down their hoes and come to the house. They obeyed, and he proceeded to the house cursing. His mother heard him, and called to Walter, who was at work near-by, to come to the house. Deceased entered the house, and, cursing his mother, told her that she had to stop pouting around there, and they would all have to go up to his house and sit down, or he would land them every one in h— before sun-

set. His mother reproved him for cursing; and he cursed her again and walked up and down the floor "popping" his fists and cursing, to the terror of the family. Shortly after his arrival, deceased with an oath sent his little brother Clyde to deceased's home, 300 yards distant, to tell "R. C.," who was there, to come on to his mother's, and the defendant dispatched Dollie for his brother-in-law, Bob McManus, who lived about a mile distant.

In the meantime deceased continued to curse and abuse his mother and the other members of the family. As soon as "R. C." arrived, deceased turned to get the gun, and told his mother to "hit the road." He told the family that they would all have to move, or he would blow their brains out. He got the gun and pointed it at his mother, and told them all that if they were slow about moving he would blow them to h—. "R. C." told him to put up the gun, and he cursed "R. C." and threatened to kill him. Defendant counseled that they yield to deceased and go to his house; and he and his mother, with her infant in her arms, and with the boy "R. C.," about 16 years of age, and the little boy Clyde, started down the public highway towards the house of deceased, the deceased putting up the gun, but following and continuing to curse them.

When the party had reached a point within about 100 yards of the house of deceased, the mother told him that she did not see how it could do any good for her to go to his house with him cursing and swearing so. Deceased replied that he didn't take such "G— d— sass" as that, and seized his mother by the throat. Defendant and the other children begged him to turn her loose, but he would not. Defendant walked up and caught deceased by the arm to pull him away from his mother, and "R. C." took the baby. The deceased turned and knocked defendant down. Deceased was much larger and stronger than defendant, and had the reputation of being violent and dangerous. Defendant is deformed. After deceased had knocked defendant down, he continued to beat him with his fists. The defendant, in the language of "R. C.," "was bent back." At this time defendant got his knife and began cutting deceased. He says that he did so to protect himself. He was afraid of deceased, and believed that deceased would kill him and his mother and brothers. "R. C."

intervened and pushed deceased back. When he did so, defendant stepped back and made no further attempt to hurt deceased. Deceased, however, on getting clear of "R. C.," again assaulted defendant. Defendant began backing away from deceased across a field. As deceased advanced on him, he cut at deceased a number of times. Deceased knocked up the last lick, and this cut his throat. This cut severed the jugular vein. Defendant says that he did not intend to cut deceased's throat; that he was not mad at deceased and did not enter into the fight willingly; that he did not think he could defend himself with his fists, and that he cut to defend himself, believing that he and the other members of the family were in danger of being killed or receiving serious bodily harm at the hands of deceased.

The only exceptions are to parts of the charge and to the refusal to give certain special instructions.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*J. W. Gulledge, J. C. Brooks, and J. J. Parker for defendant.*

ALLEN, J. The first exception is to the charge, where his Honor said: "But if an assault is made, and the person assaulted does not apprehend, and does not have reasonable grounds for apprehending, either that his life is in danger or that he is in danger of great bodily harm, it is his duty ordinarily to abandon the contest if a way is open for retreat, before taking the life of his assailant. Under such circumstances, it is the duty of the person assaulted to abandon the contest if he can do so with reasonable safety."

In this connection, his Honor also charged: "If you find from the evidence that deceased made an assault upon the defendant without a deadly weapon, you may consider all evidence tending to show the relative size, strength, and position of deceased and defendant, together with other circumstances arising upon the evidence, in determining whether the fierceness of the assault upon the part of the deceased was such that the defendant apprehended, or had reasonable grounds to apprehend, either that he was in danger of losing his life or of great bodily harm at the

hands of the deceased. . . . Where a man is in a place where he has a right to be, and is doing what he has a right to do, and is assaulted in a violent manner and under such circumstances as reasonably to lead him to believe, and he does believe, that he is in danger of being killed or of receiving some serious bodily harm, and he is himself without fault, the law does not require him to flee, but he may stand his ground and repel his assailant with such force as may appear to him, under all the circumstances, to be reasonably necessary."

The charge is fully supported by the authorities. *S. v. Blevins,* 138 N. C., 668; *S. v. Dove,* 156 N. C., 653.

The second exception is to the refusal to charge the jury that, "if they find from the testimony that the deceased laid his hands in rudeness or in violence upon the defendant's mother, and the defendant had reason to believe and did believe that his mother was in danger of receiving injury at the hands of the deceased, then the defendant had the right to use such force as was reasonably necessary to repel the attack upon his mother."

This prayer was substantially given when the court said: "There is evidence tending to show that the deceased assaulted his mother. The court charges you that members of a family have the legal right to protect and defend one another. But the right to defend another can be no greater than the latter's right to defend himself. Though a son may fight in defense of his mother, the son's act must receive the same construction the act of the mother would have received if it had been done by herself. If you find from the evidence that the deceased made an assault on the defendant's mother, she had the legal right to use such force as was necessary, or such force as reasonably appeared to her to be necessary, to repel the assault. And if you find from the evidence that the defendant under these circumstances seized the deceased when he was in the act of making an assault on their mother, and that the defendant used no greater force than the mother had a legal right to use under the same circumstances, and that a combat immediately thereafter ensued between deceased and defendant, the defendant in doing so would not, for this reason, be deemed to be in fault in bringing on the fight, and the defendant would not, for this reason, be denied the right

of relying upon the plea of self-defense. If you find from the evidence that the deceased assaulted the defendant because the defendant intervened between him and his mother, under the circumstances which have just been stated, and for the defense of his mother, the act of the defendant would not be deemed to be a legal provocation for an assault by the deceased upon the defendant; and if you find from the evidence that the deceased assaulted the defendant under these circumstances, you will then find that the defendant had a legal right to use such force as was necessary, or such force as reasonably appeared to him to be necessary, under the circumstances, to repel the assault. He had the legal right to use such force as was necessary, or such as reasonably appeared to him to be necessary, to save his life or prevent great bodily harm."

The qualification that the conduct of the defendant in fighting in defense of his mother must receive the same construction as her conduct in her own defense is in accord with our decisions. *S. v. Greer,* 162 N. C., 648.

The third exception is to the failure to instruct the jury under what circumstances the defendant would be without fault, and to the refusal to give the following instruction: "The court charges you that when a man is in a place where he has a right to be, and is doing what he has a right to do, and is assaulted in a violent manner and under such circumstances as to reasonably lead him to believe, and he does believe, that he is in danger of being killed or of receiving some serious bodily harm at the hands of his assailant, the law does not require him to flee, but he may stand his ground and defend himself with such force as may appear to him under the circumstances to be reasonably necessary; and if he kills his assailant in so doing, the law calls it justifiable self-defense."

The instruction was given as requested, except the words "being without fault" were added, and the jury were told that the test of the defendant being without fault was not that he fought willingly, but, Did he provoke or bring on the difficulty?

Thus explained, the charge was equivalent to saying that if the defendant was where he had a right to be, and was doing

what he had the right to do, and he did not provoke or bring on the difficulty, he was not required to flee, and could defend himself, which was favorable to the defendant.

The fourth exception is to the charge that the defendant must be without fault, and has been already considered.

The fifth exception is to the refusal to instruct the jury that, "although under ordinary conditions the law does not excuse the use of a deadly weapon to repel a simple assault, this principle does not apply where from the testimony it may be inferred that the use of such weapon was or appeared to be reasonably necessary to save the person assaulted from great bodily harm, such person having been in no default in bringing on or unlawfully entering into the fight. In such case the defendant's right of self-defense is a question for the jury. It is not necessary to the existence of this right that the defendant should have been assailed with a deadly weapon. The jury may consider the fierceness of the assault upon him, the position of the parties, and the difference in their relative size and strength, with a view of determining whether, under all the circumstances, the defendant was reasonably led to believe and did believe that he was in danger of being killed or of receiving serious bodily harm at the hands of the deceased."

The instruction is taken from *S. v. Hill,* 141 N. C., 771, and was given, except his Honor added the language taken from the opinion in the *Hill case,* and omitted in the instruction: "It may, in exceptional instances, arise when the fierceness of this assault, the position of the parties, and the great difference in their relative sizes or strength show that the danger of great bodily harm is imminent," and then follows the first excerpt from the charge, copied in this opinion, thereby applying the exceptional cases to the contentions of the defendant.

The degree of force which the defendant could use in his self-defense, and how the evidence should be considered, were carfully explained to the jury, and there was no error in the charge that the killing with a deadly weapon being proven or admitted, the burden would then be on the defendant to prove matters in excuse or mitigation, with the explanation that this rule did not require the defendant to introduce evidence, and that he could rely on the evidence for the State.

The charge, considered as a whole, is clear, full, and accurate, and fairly presents the contentions of the defendant as to law and fact.

No error.