STATE v. GLEN HOLLAND.

(Filed 11 May, 1927.)

**1. Homicide—Murder—Self-Defense—Evidence—Questions for Jury.**

A homicide is justifiable when the killing is done under a reasonable apprehension under the circumstances that it was necessary to prevent the killing of the accused, or to save himself from great bodily harm, and the question of the reasonableness of such apprehension under the circumstances is one for the jury.

**2. Same—Evidence—Questions for Jury.**

Upon the question of justifiable homicide, evidence is permissible that tends to show that the defendant was physically greatly inferior to the deceased, knew of his dangerous character or reputation, and of threats made by him against his life, had previously been assaulted without provocation by the deceased, and that at the time of the killing he had retreated before him in fear as he advanced upon him until prevented by his surroundings.

**3. Homicide—Evidence — Self-Defense — Collective Facts — Appeal and Error—Prejudice—Reversible Error.**

Where there is evidence tending to show that the accused killed the deceased under a reasonable apprehension of his own death or of receiving great bodily harm from him; that he unexpectedly met the deceased at the door of the room he was leaving, his testimony that he "could tell from the appearance of the deceased, when he came in the cafe door, and jumped at me, that he was mad. I think he was drinking," is competent as a statement of collective simple facts calling for an ordinary and natural inference, which conclusion in itself is a statement of a fact, and its exclusion by the trial judge constitutes prejudicial and reversible error under the evidence of this case.

APPEAL by defendant from *Harwood, J.,* and a jury, at November Term, 1926, of CATAWBA. New trial.

The defendant was convicted of murder in the second degree and sentenced to be confined in the State's prison for twelve years at hard labor.

The substance of the State's evidence: Defendant, Glen Holland, killed Paul Donkel, 24 October, 1926, about 3 o'clock in the evening, in the Riverside Cafe in the town of Brookford. The cafe had the usual counters, stools, etc. Donkel was killed near the back of the room. He was shot once through the eye. Deceased weighed about 170 pounds, was about 21 years old. When examined a short time after the killing by the sheriff he had in his hip pocket three-fourths of a pint of whiskey. The only means of ingress and egress to the cafe from the public road is the front door. The defendant was in the cafe and had a pet squirrel. He asked Dewey Austin, State's witness, who was in the cafe, to keep the squirrel, and gave him some chestnuts to feed it, as he was going out to take his girl to ride. He started towards the front door, the only way out, in a perfectly good humor. The deceased came in the front door, meeting defendant going out. Defendant commenced backing, with his hand on his right hip pocket. Nothing was seen in deceased's hands. Defendant was backing and deceased walking towards him. Defendant backed and deceased followed him twelve or fifteen feet. Deceased was about six feet from defendant when defendant shot him—got his pistol from his hip pocket and shot deceased one time. Deceased fell and did not move. Defendant got his squirrel off Austin's shoulder and went out the door. Both had been in the cafe that morning

about 11 o'clock and at one o'clock, but did not speak to each other. When deceased was walking towards defendant he was taking slow, short, steps. Defendant said, "Don't come on me, Paul" (meaning Donkel), and deceased said, "Don't pull no G—d— knife on me." He looked as if he was going to get hold of defendant and he seemed about half mad. Defendant backed up behind the stove in the corner. Defendant looked like he was frightened and scared. When deceased came in the door he lit a cigarette, was smiling and said to some one that he was going to knock "H— out of somebody." Some one said, "No, I would not do that." Defendant said, "Paul, don't come on me." Deceased said, "Don't pull no G—d— knife on me." Defendant kept telling deceased not to come on him, until he got next to the stove; deceased kept walking towards him; then defendant shot. From where Holland shot it was about twenty-five feet to the door. Deceased had a cigarette in his left hand. The only means of escape was going out the front door.

Jesse Smith, for the State, testified in part: "About three months before this shooting occurred I witnessed a difficulty between them— Paul Donkel and Glen Holland. They had a little trouble at the Riverside Cafe on Saturday night. After Paul hit Glen, Glen said: 'You son of a b—, I will get you later.' Paul started walking off, then stopped and said, 'You can get me now if you want to,' and Glen said, 'I will get you later.' This happened out in front of the Riverside Cafe."

When this occurrence took place defendant was assaulted by deceased while sitting in the car talking to Nora Hefner in front of the cafe. This witness admitted (1) he was sentenced to the roads for forgery, (2) accused of breaking in store at Brookford and stealing goods, (3) convicted of fighting two or three times and sent to the roads, (4) been off and on the roads for past two or three years, (5) been accused of selling liquor, "but they never did catch me."

Charlie Nance, an uncle of deceased, testified in part: "He (defendant) said he was not going to whip Paul (deceased), but he was going to shoot h— out of him. This happened the last of September."

Dr. Ford testified that the general reputation of Nance was good.

The defendant testified, in part, that he was 18 years old and weighed about 140 pounds. Knew deceased for ten or twelve years; lived about three miles apart. Was in the cafe about 11 o'clock and about 1 o'clock and saw deceased, but no word was spoken between them. Went to cafe about 3 o'clock, drank a coca-cola, gave pet squirrel to Dewey Austin to keep for him for about half an hour. "I was going to take my girl, Nora Hefner, for a ride when I left the cafe." He described the cafe room and testified as to the occurrence: "I started to go get

in my car to take my girl to ride. I got within two or three feet from the door. Donkel came in, and the first I heard him say was, 'G— d— you, I am going to kill you or knock h— out of you,' or something like that, and then he jumped at me. I began to back. I had gotten within about three or four feet of the door, which was about twenty-five feet from where I had been with the squirrel and the other folks. I did not know Paul Donkel was at the door until he spoke. I began to back away and said, 'Paul, don't come, don't come on me,' three or four times. I backed as far as I could between the counters and back behind the stove, and when I got back there I said again, 'Paul, don't come on me,' and he started to take another step towards me and I shot him one time for the purpose of stopping him. I backed back twenty or twenty-five feet pretty rapidly. I was scared he was going to kill me, and was trying to get out of his way. I was watching him. Paul had his hand right on his hip pocket like that (showing the jury), under his coat, when he began to come on me. I did not observe his left hand. He spoke something to me several times after he jumped from the door to me. I was too scared to notice much of anything. He was coming on me and had me hemmed up in the corner, and I said, 'Paul, don't come on me; I don't want to have any trouble,' and he says, 'Don't you pull no G— d— knife on me.' Where I was I could not step back any further. I believed he was armed. I shot Paul Donkel because I was scared of him and wanted to stop him. I knew he was a dangerous man. I was scared he was going to kill me, and I just had to do it. I shot him for the purpose of stopping him. After I shot him, I left the building. I came back on the following Thursday and gave myself up to the sheriff. I know that Paul Donkel had made threats towards me before 24 October. It was in the city jail one Saturday morning a couple of months before 24 October. G. C. Travis, chief of police of Brookford, was present at the time he made the threat. Brookford is about three miles from Hickory. Paul Donkel was locked up in jail. He walked up to my car one night while I was sitting there talking to my girl, Nora Hefner, and hit me. He nearly beat me up. The next morning I went to the police and had a warrant sworn out. He sent for me while he was in jail and said he wanted to see me. I went back there and he said, 'G— d— you, you son a b—; I have not done no life-time crime, and I will get out some time, and when I do I am going to kill you.' . . . The next threat that I heard him make against me was one Saturday afternoon. I was standing on my father's porch and he was in front of B. L. Pitts' store. Mr. Pitts is a merchant at Brookford and is here now. Paul said, 'G— d— you, you son of a b—, I am going to kill you.' He was talking to Mr. Pitts about me. I turned around and went into father's store. Since that time a number of

threats have been communicated to me that the deceased, Paul Donkel, made against me. . . . Arthur Hefner said Paul said, 'I am going to throw dynamite under the G— d— car and blow me into h—.' . . . Will Krider said Paul said, 'He wished he could lay off from work just about one hour; that he would like to kill that son of a b—.' Paul was working on the yard force with Will Krider. . . . I recall when it was that Paul began to show a decided hatred for me. It was when I had the warrant taken out for him, and I was summoned on a case where I had seen him cut a man—Ern Julian. I had sworn against him for the State. They had me summoned, and after I had the warrant taken out it seemed to me that he always had it in for me ever since then. I did not have anything to do with the warrant in the Ern Julian case. After I was subpœnaed as a witness, he struck me when I was in my car with Nora Hefner. These two cases were tried together at the same time in Hickory, and I was witness for the State. Up to that time I do not know of any feeling he had towards me. On one occasion when I passed riding in my car and passed where he was walking, Paul Donkel threw a rock at me and hit the back of my car— dented in the back of the car where it hit. That was tried in the recorder's court in Hickory. I did not know he was about before the rock hit the car. There were four or five of them together in the road. I got the pistol that I shot Paul Donkel with some four or five months ago. I put it in my pocket the Saturday night before. I had heard that Paul Donkel was in Catawba County. I was not looking for him in the least. I lived about half a mile from the Riverside Cafe."

Q. State whether or not, or did you know the general reputation of the deceased, Paul Donkel, as being a dangerous and violent man? A. Yes, he was dangerous. I was scared of him.

Q. Answer the question whether or not it was good or bad. A. It was bad."

He denied, as did Nora Hefner, that he made any statement as testified to by State's witness, Jesse Smith. He denied that he had any ill feeling towards deceased at the time of the killing. Denied the threat as testified to by Nance, or that he had made any threat against Donkel.

The following answer to a question asked defendant was objected-to by the State and motion to strike out allowed by the court below, the answer to which defendant excepted and assigned error, is as follows: *"I could tell from the appearance of the deceased, Paul Donkel, when he came in the cafe door and jumped at me that he was mad. I think he was drinking."*

Numerous witnesses for defendant testified that the general reputation of deceased as a dangerous and violent man was bad, including the chief of police and mayor of Brookford. Defendant testified as to

communicated and uncommunicated threats. There was testimony as to the general reputation of defendant by one witness as being bad for drinking and fighting, and by two witnesses bad and pretty bad for fighting, to which defendant excepted and assigned error. From judgment rendered defendant appealed to Supreme Court. The above assignment of error is the only one necessary to be considered.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Wilson Warlick, A. A. Whitener, Whitener & Whitener and C. L. Whitener for defendant.*

CLARKSON, J. The first law of nature is that of self-defense. The law of this State and elsewhere recognizes this primary impulse and inherent right. One being without fault, in defense of his person, in the exercise of ordinary firmness has a right to invoke this law and kill his assailant, if he has reasonable ground for believing or apprehending that he is about to suffer death or great or enormous bodily harm at his hands. The danger or necessity may be real or apparent. It is for the jury, and not the party setting up the plea, to determine, under all the facts and circumstances, the reasonableness of the grounds for the belief or apprehension of the real or apparent danger or necessity. The mere fact that a man believes or apprehends that he is in present, immediate and imminent danger of death or great bodily harm, is not sufficient to justify the taking of the life of a human being, but there must be reasonable ground for the belief or apprehension—an honest and well-founded belief or apprehension at the time the homicide is committed. *S. v. Dixon,* 75 N. C., 275; *S. v. Turpin,* 77 N. C., 473; *S. v. Barrett,* 132 N. C., p. 1005; *S. v. Lipscomb,* 134 N. C., p. 689; *S. v. Garland,* 138 N. C., p. 675; *S. v. Lilliston,* 141 N. C., p. 857; *S. v. Blackwell,* 162 N. C., p. 672; *S. v. Thomas,* 184 N. C., p. 757; *S. v. Johnson,* 184 N. C., p. 789; *S. v. Bost,* 192 N. C., p. 1; Horrigan & Thompson, Cases of Self-Defense, p. 968-9.

In *S. v. Hand,* 170 N. C., at p. 706, it is said: "It is well-settled law that when the killing with a deadly weapon has been proven or admitted, the burden is on the prisoner to show excuse or mitigation. *S. v. Gaddy,* 166 N. C., 341; *S. v. Yates,* 155 N. C., 450; *S. v. Rowe, ibid.,* 436; *S. v. Simonds,* 154 N. C., 197; *S. v. Brittian,* 89 N. C., 481."

In *S. v. Johnson,* 166 N. C., at p. 395, speaking to the question: "This Court said in *S. v. Gray,* 162 N. C., 612, that 'One may kill when necessary in defense of himself, his family, or his home, and he has the same right when not actually necessary, if he believes it to be so, and he has a reasonable ground for the belief,' and in *S. v. Kimbrell,* 151 N. C., 709, 'If there was *any* evidence to go to the jury in support of

this contention, then it was for the *jury,* and not for the *court,* to pass upon the question of his *motive* in firing the shots, as well as the *reasonableness* of the grounds of his apprehension. *S. v. Nash,* 88 N. C., 618; *S. v. Harris,* 119 N. C., 861; *S. v. Hough,* 138 N. C., 663; *S. v. Blevins,* 138 N. C., 668; *S. v. Castle,* 133 N. C., 769; *S. v. Clark,* 134 N. C., 699; *S. v. Barrett,* 132 N. C., 1005.' "

"One cannot be expected to encounter a lion as he would a lamb." *S. v. Floyd,* 51 N. C., 392; *S. v. Williams,* 186 N. C.; p. 627.

In *S. v. Turpin,* 77 N. C., at p. 477, it is held: "Where one is drawn into a combat of this nature by the very instinct and constitution of his being, he is obliged to estimate the danger in which he has been placed, and the kind and degree of resistance necessary to his defense. To do this he must consider not only the size and strength of his foe, how he is armed, and his threats, but also his character as a violent and dangerous man. It is sound sense, and we think sound law, that before a jury shall be required to say whether the defendant did anything more than a reasonable man should have done under the circumstances, it should, as far as can be, be placed in the defendant's situation, surrounded with the same appearances of danger, with the same degree of knowledge of the deceased's probable purpose which the defendant possessed. If the prisoner was ignorant of the character of the deceased, then the proof of it would have been inadmissible, because his action could not have been influenced by the dangerous character of a man of whom he had no knowledge." *S. v. Matthews,* 78 N. C., 523; *S. v. Hensley,* 94 N. C., 1021; *S. v. Rollins,* 113 N. C., 722; *S. v. Byrd,* 121 N. C., 684; *S. v. McIver,* 125 N. C., 645; *S. v. Sumner,* 130 N. C., 718; *S. v. Blackwell, supra.*

In *S. v. Hough,* 138 N. C., at p. 667-8, it is said: "It is true there is no evidence that the deceased was armed with a deadly weapon, at least none was exhibited, but the evidence does show that the deceased had sent word to the defendant that he intended to kill him, and the defendant had a right to suppose that the deceased was endeavoring to carry out his threat and was prepared to do it. Then, again, the evidence shows there was an enormous disparity in the relative strength and power of the defendant and deceased, the one being a weakly, delicate man of very small stature; the other, in comparison, being a giant of violent nature, and evidently capable of either killing the defendant or doing him great bodily harm without the aid of a weapon. The defendant was on his own premises, engaged in his peaceful pursuits at the time the deceased advanced on him in a manner giving unmistakable evidence of his purpose to do the defendant bodily harm."

In *S. v. Barrett,* 132 N. C., at p. 1010, it is said: "There is a marked difference between an actual necessity for killing and that reasonable

apprehension of losing life or receiving great bodily harm, which is all that the law requires of the prisoner in order to excuse the killing of his adversary, and it was just this difference that may have caused the jury to decide against the prisoner upon this most important issue in the case." *S. v. Johnson,* 184 N. C., p. 637; *S. v. Bush,* 184 N. C., p. 778.

With these principles of law well settled in this State, we come to the vital assignment of error of defendant.

Defendant objected and assigned error in the court below striking out the following testimony of the defendant: *"I could tell from the appearance of the deceased, Paul Donkel, when he came in the cafe door and jumped at me that he was mad. I think he was drinking."* We think this evidence was competent.

In *S. v. Leak,* 156 N. C., at p. 647, this Court, speaking to the subject, said: "The rule applicable to evidence of this character is clearly and accurately stated in McKelvey on Evidence, p. 220 *et seq.,* as follows: 'The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals and things, derived from observation of a variety of facts presented to the senses at one and the same time are, legally speaking, matters of fact, and are admissible in evidence. A witness may say that a man appeared intoxicated or angry or pleased. In one sense the statement is a conclusion or opinion of the witness, but in a legal sense, and within the meaning of the phrase 'matter of fact,' as used in the law of evidence, it is not opinion, but is one of the class of things above mentioned, which are better regarded as matters of fact. The appearance of a man, his actions, his expression, his conversation—a series of things—go to make up the mental picture in the mind of the witness which leads to a knowledge which is as certain, and as much a matter of fact as if he testified, from evidence presented to his eyes, to the color of a person's hair, or any other physical fact of like nature. This class of evidence is treated in many of the cases of opinion admitted under the exception to the general rule, and in others as matter of fact—'shorthand statement of fact,' as it is called. It seems more accurate to treat it as fact, as it embraces only those impressions which are practically instantaneous, and require no conscious act of judgment in their formation. The evidence is almost universally admitted, and very properly, as it is helpful to the jury in aiding to a clearer comprehension of the facts.' " *Renn v. R. R.,* 170 N. C., 128; *S. v. Spencer,* 176 N. C., 709.

Mr. Nash, for the State, in his argument with his usual intellectual honesty admits error, but contends it was harmless. We cannot so hold. The deceased, Paul Donkel, cursed defendant, Glen Holland, and told him, while in jail, "I will get out some time, and when I do I am going

to kill you." Other threats had been made to defendant, and repeated threats made by deceased against defendant's life had been communicated to him. Defendant had seen deceased cut Ern Julian, and because defendant was subpœnaed as a witness deceased "struck me when I was in my car with Nora Heffner"—"he nearly beat me up." Defendant knew deceased's general reputation was bad as being a dangerous and violent man. The appearance of the deceased, as he came in the cafe, under the facts and circumstances of this case, was all important to the defendant. The reasonableness of the ground for his belief or apprehension of danger to life or great bodily harm was for the jury to pass on, but the defendant had a right to state the action and appearance of the deceased as he came in the cafe door: (1) he jumped at him, (2) he was mad, (3) thought he was drinking. This was competent evidence and the exclusion prejudicial. Defendant was entitled to the impression made on him with the previous known threats and the knowledge of deceased's general reputation as a violent and dangerous man, which would indicate to him that he was not going to encounter a lamb. This aspect he was entitled to have considered by the jury in weighing his conduct with the other evidence as to the reasonableness of the grounds of his belief or apprehension that he was about to suffer death or great bodily harm at the hands of the deceased. The probative force was for the jury.

As the case goes back for a new trial, the other exceptions we do not think necessary to pass on. For the reasons given, there must be a

New trial.