STATE v. VES WINGLER, Alias U. G. WINGLER.

(Filed 13 December, 1922.)

1. **Instructions — Evidence — Criminal Law—Homicide—Murder—Man-slaughter.**

   Where the defendant is being tried for homicide and the State has introduced evidence of his admission of the crime and circumstantial evidence tending to show his guilt, a defense solely upon the ground that the deceased was killed by an accident to herself wherein the defendant was not at all involved, does not present any evidence coming within the definition of manslaughter, and the trial judge commits no error in refusing to charge the law relating thereto. *S. v. Myrick,* 171 N. C., 791, cited and distinguished.

2. **Trials—Evidence—Questions for Jury.**

   The weight and credibility of the evidence are matters within the province of the jury to determine, under a proper instruction by the court of the law thereto applicable.

APPEAL by defendant from *McElroy, J.,* at August Term, 1922, of WILKES.

Criminal prosecution, tried upon an indictment charging the defendant with the murder of his wife.

The defendant was convicted of murder in the second degree, and from the judgment pronounced thereon he appealed, assigning errors.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*
*John R. Jones and T. C. Bowie for defendant.*

STACY, J.  In 1891 the defendant, Ves Wingler, married Candace Miller, the daughter of Nathan Miller, of Wilkes County.  These two people lived together as man and wife for two years and seven days. At first they resided with the defendant's mother; and then they moved to themselves and lived in a log cabin, situate on the mountain side about 17 or 18 miles from North Wilkesboro, N. C.  At that time the only way of getting in and out of this country was by a wagon road and "by walk-ways which lead across ridges and hollows and creeks."  Here a child was born to this union, and apparently they were contented, if not happy, in their poor and humble home.

On 10 May, 1893, Candace Wingler, wife of the defendant, died under rather peculiar and suspicious circumstances.  A coroner's inquest was held six days thereafter, and again on 23 May, 1893, the coroner's jury was reassembled, additional evidence was offered for its consideration; the body of the deceased was exhumed and on examination by Dr. J. M. Turner was made in the presence of the jury.  The coroner's jury finally rendered a verdict that the deceased met her death by accidentally falling out of the loft of the defendant's cabin and striking her head against the stone hearth and hitting her shoulder and neck against the ear and sharp wire bail of a pot in the fire place.  This was the defendant's version, given at the trial, as to how she received her fatal injuries.

In 1894, about ten months after Candace Wingler's death, the defendant married Melvina Wingler, the 16-year-old daughter of John Wingler.  With his second wife, the defendant has since lived in the same community and raised another family.  The child by his first wife was cared for largely by her grandmother, Mrs. Ann Miller.

In April, 1922, Ves Wingler swore out a warrant against one of John Shepherd's boys, charging him with an assault upon his 9-year-old daughter by striking her in the face and knocking out some of her teeth.  He was not arrested, but is now a fugitive from justice.  Two days thereafter, John Shepherd made an affidavit before a justice of the peace, upon which the warrant and subsequent indictment of the defendant were based, charging that the defendant had admitted to him, in the presence of others, at the time of his first wife's death, that he, the defendant, had killed her.

The defendant contended that his wife had climbed into the loft of their cabin to put away a pot of soap which she had made, and that she fell through an opening for a distance of eight or ten feet, striking her head against the stone hearth, crushing her skull and causing her death. The defendant further testified that, upon discovering his wife's condition, he ran out of the house and over the hill with a call for help from his neighbors, relatives, and friends.

The State contended, and offered evidence tending to show, by those who responded to the defendant's distress signal and who saw his wife before her death, that the deceased was a strong, vigorous woman; that she had a number of bruises on her body; that her skull was crushed on the back and left side; that her right shoulder showed a deep gash near the neck; that her right arm and the fingers of her right hand were cut; that her tongue was cut about two-thirds in two; that her thighs were bruised in two places, in front and behind, and that she was very bloody. There was evidence also to the effect that blood was found in the yard, on the steps, in the house, and the prints of a woman's bloody hand was seen on the wall; that a bloody mattock lay on the floor, the blade of which was about the size of the gash in her shoulder; that there was no hole or opening in the loft through which her body could have passed; that when this circumstance, among others, was called to the defendant's attention by his mother and sister in the presence of, John Shepherd (who gives this evidence), he said: "Yes, I killed her with the mattock; but, in the name of God, don't tell it. Tell that she fell out of the loft and killed herself. . . . For God's sake, open a place and tell she fell through there," and then, turning to John Shepherd, he exclaimed: "John, God damn you, if you ever tell it, I will kill you."

The State's witness, John Shepherd, in explanation of why he withheld this evidence from the officers of the law for so long a period, stated that he was afraid the defendant would kill him, or do him great bodily harm, if he told it; but that, after he had been converted and professed religion, in the spring of 1922, the matter bore upon his mind to such an extent that he felt compelled to give the authorities the information he had, and thus relieve himself of the burden he had been carrying for so many years. This witness further stated that on one occasion, when the defendant was drunk, he told him that he killed his first wife in order to get rid of her and to marry Melvina Wingler, but added: "If you ever tell it I will kill you."

The defendant, on the other hand, contended that the testimony of John Shepherd was false in its entirety; that it was born of a malicious and revengeful spirit, occasioned by the attempted arrest of his boy at the instance of the defendant. There was further evidence on behalf of the defendant tending to impeach the character and reputation of the

principal witnesses for the State, and there was evidence in rebuttal offered by the State, derogatory of the defendant's character and standing in the community.

Upon this circumstantial evidence and alleged confession of guilt, the jury returned a verdict of murder in the second degree, and the court imposed an indeterminate sentence of not less than 25 years nor more than 30 years at hard labor in the State's Prison.

The only material exception presented for our consideration is the one directed to the following portion of his Honor's charge: "In this case, gentlemen of the jury, the court charges you that there is no evidence of manslaughter in the case, and your verdict will be either guilty of murder in the first degree, murder in the second degree, or not guilty, as you may find and be satisfied from the evidence in the case."

The principle here invoked by the defendant, and which he alleges was violated by this instruction of the court, is stated by *Hoke, J.,* in *S. v. Merrick,* 171 N. C., 791, as follows: "It has been held with us in numerous cases, and the position is in accord with authoritative decisions elsewhere, that where in an indictment for murder the law in this State permitting a verdict for a lesser grade of the crime, if there are facts in evidence tending to reduce the crime to manslaughter, it is the duty of the presiding judge to submit this view of the case to the jury under a correct charge, and his failure to do so will constitute reversible error, though the defendant may have been convicted for the higher offense," citing a number of authorities.

The foregoing, of course, is a correct statement of the law, but a careful perusal of the present record convinces us that this principle is not applicable to the facts of the instant case, and that the defendant's exception must be overruled. There is no evidence upon which a verdict of manslaughter could have been based, hence the rule as stated does not apply. Indeed, the defendant's own testimony positively runs counter to any inference of manslaughter. He testified that the deceased had given him no offense, and that there was no occasion or cause for her murder. *S. v. Johnson,* 161 N. C., 264; *S. v. Bowman,* 152 N. C., 817; *S. v. Teachey,* 138 N. C., 598.

There are several other exceptions relating to the admission and exclusion of evidence, but none apparently of sufficient merit to warrant an extended discussion. The weight and credibility of the testimony was for the jury, and it has found the facts at variance with the defendant's contention. The State's evidence, if believed in its entirety, would have justified a more serious verdict. But the jury, in the discharge of its duty, has acquitted the defendant of the capital offense.

This is a remarkable case in many respects. Its opening scene is one of romance; it then moves on from suggested intrigue to ultimate

tragedy. So far as our records disclose, it is without a parallel in the judicial history of the State. It seems to stand alone and apparently is *sui generis.*

Three decades ago, Ves Wingler, with axe in hand, cut from the virgin forests of Wilkes County the logs and the timbers with which he built upon the mountain side a crude and humble hut for himself and Candace Wingler, his wife. Here this couple started life together in a rough, rugged, mountain home—a log cabin, in fact—but to the deceased it was at least a stable and a manger. The only means of getting in and out of this country at that time was by a wagon road and by walkways which led across ridges and hollows and creeks. In winter there was a scene of leafless branches, snow-covered peaks, and frozen brooks; and that was poverty. But the defendant and his wife were not daunted by the dangers of the inaccessible hills, nor by the frightful stories of the mountain coves. They started life with high hopes and with a faith that knew no fears, waiting and praying for the dawn of a better day.

It matters not on what plane of life one labors, nor how large or small the number of his acquaintances, the man who toils and yet knows that in the circle of his influence there is at least one life in which there is sunshine where but for him there would have been shadow; that there is at least one home in which there is cheer where but for him there would have been gloom; that there is at least one heart in which there is hope where but for him there would have been despair, that man carries with him as he goes one of the richest treasures on this earth. This was the goal for which Ves Wingler was striving thirty years ago. But, alas, another story is told. He soon grew weary of his wife, and for some reason, not clearly disclosed by the record, he took her life in a cruel and heartless manner. Evidence of the crime was concealed at the time; he married again, raised another family, and, after the lapse of twenty-nine years was, arrested, tried, convicted, and sentenced to the State's Prison. Though justice sometimes treads with leaden feet, if need be, she strikes with an iron hand. Verily, the wages of sin is death, and sin pays its wages.

The supreme tragedy of life is the immolation of woman. With a heavy hand, nature exacts from her a high tax of blood and tears. The age of knighthood has passed and is gone, but let us hope that the spirit of chivalry may never die. No civilization can last where women are permitted to be butchered like sheep in the shambles. Surely there is no pleasure to be derived from the punishment of the wicked, but it would seem that this defendant ought to welcome an opportunity to expiate his crime and to make some atonement for it. No doubt, in his own conscience, he has already suffered the agony of remorse. How,

through the many years, has it been possible for him to banish from his mind the vision of the woman who, in the days of her youth, put her hand in his, with a promise to forsake all others and to follow him? At the altar she vowed, in substance, that "whither thou goest, I will go; and where thou lodgest, I will lodge; thy people shall be my people, and thy God my God." Can the defendant ever forget that momentous hour when this woman, with heroic courage, took immortality by the hand and went down into the valley of the shadow of death that his child might live? And then, can he for a moment cease to hear her screams of terror as she fled from his murderous hand?

The fates decreed for Candace Miller a hard lot and a cruel death, but—

> "Oh, can it be the gates ajar
> Wait not her humble quest?"

There is no error appearing on the record, except the great error of the defendant in murdering his wife; but this is a mistake which is beyond our province or power to correct.

> "Repose upon her soulless face,
>     Dig the grave and leave her;
> But breathe a prayer that, in His grace,
> He who so loved this toiling race
>     To endless rest receive her."
>                                      —*McNeill.*

The trial and judgment of the Superior Court will be upheld. No error.