STATE OF NORTH CAROLINA v. JUDY ANN LAWS NORMAN

No. 161PA88

(Filed 5 April 1989)

**Homicide § 28.1— self-defense—sleeping victim—battered spouse syndrome**

The evidence in a first degree murder prosecution did not entitle defendant to jury instructions on either perfect or imperfect self-defense where defendant presented evidence of a long history of physical and mental abuse by her husband due to his alcoholism; unsuccessful efforts to obtain help from authorities; expert testimony that defendant fit the profile of battered wife syndrome and that she had felt that she had no choice but to use deadly force against her husband; and defendant had pointed a pistol at the back of her sleeping husband's head, cleared a jam, shot her husband in the back of the head as he still lay sleeping, felt her husband's chest and determined that he was still breathing and making sounds, and then shot him twice more in the back of the head. There was no evidence that at the time of the killing defendant reasonably believed herself to be confronted by circumstances which necessitated her killing her husband to save herself from imminent death or great bodily harm. Even assuming that defendant was entitled to an instruction on imperfect self-defense, failure to give such an instruction was harmless error because defendant was found guilty of voluntary manslaughter. Requiring jury instructions on perfect self-defense in such situations would tend to make opportune homicide lawful as a result of mere subjective predictions of indefinite future assaults and circumstances.

Justice MARTIN dissenting.

ON discretionary review of the decision of the Court of Appeals, 89 N.C. App. 384, 366 S.E. 2d 586 (1988), setting aside a judgment entered by *Gardner, J.*, in the Superior Court, RUTHERFORD County, on 5 March 1987, and awarding the defendant a new trial. Heard in the Supreme Court on 16 November 1988.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, and Jeffrey P. Gray, Assistant Attorney General, for the appellant State.*

*Robert W. Wolf and Robert L. Harris for the defendant appellee.*

MITCHELL, Justice.

The defendant was tried at the 16 February 1987 Criminal Session of Superior Court for Rutherford County upon a proper indictment charging her with the first degree murder of her hus-

State v. Norman

band. The jury found the defendant guilty of voluntary manslaughter. The defendant appealed from the trial court's judgment sentencing her to six years imprisonment.

The Court of Appeals granted a new trial, citing as error the trial court's refusal to submit a possible verdict of acquittal by reason of perfect self-defense. Notwithstanding the uncontroverted evidence that the defendant shot her husband three times in the back of the head as he lay sleeping in his bed, the Court of Appeals held that the defendant's evidence that she exhibited what has come to be called "the battered wife syndrome" entitled her to have the jury consider whether the homicide was an act of perfect self-defense and, thus, not a legal wrong.

We conclude that the evidence introduced in this case would not support a finding that the defendant killed her husband due to a reasonable fear of imminent death or great bodily harm, as is required before a defendant is entitled to jury instructions concerning either perfect or imperfect self-defense. Therefore, the trial court properly declined to instruct the jury on the law relating to self-defense. Accordingly, we reverse the Court of Appeals.

At trial, the State presented the testimony of Deputy Sheriff R. H. Epley of the Rutherford County Sheriff's Department, who was called to the Norman residence on the night of 12 June 1985. Inside the home, Epley found the defendant's husband, John Thomas Norman, lying on a bed in a rear bedroom with his face toward the wall and his back toward the middle of the room. He was dead, but blood was still coming from wounds to the back of his head. A later autopsy revealed three gunshot wounds to the head, two of which caused fatal brain injury. The autopsy also revealed a .12 percent blood alcohol level in the victim's body.

Later that night, the defendant related an account of the events leading to the killing, after Epley had advised her of her constitutional rights and she had waived her right to remain silent. The defendant told Epley that her husband had been beating her all day and had made her lie down on the floor while he slept on the bed. After her husband fell asleep, the defendant carried her grandchild to the defendant's mother's house. The defendant took a pistol from her mother's purse and walked the short distance back to her home. She pointed the pistol at the

State v. Norman

back of her sleeping husband's head, but it jammed the first time she tried to shoot him. She fixed the gun and then shot her husband in the back of the head as he lay sleeping. After one shot, she felt her husband's chest and determined that he was still breathing and making sounds. She then shot him twice more in the back of the head. The defendant told Epley that she killed her husband because "she took all she was going to take from him so she shot him."

The defendant presented evidence tending to show a long history of physical and mental abuse by her husband due to his alcoholism. At the time of the killing, the thirty-nine-year-old defendant and her husband had been married almost twenty-five years and had several children. The defendant testified that her husband had started drinking and abusing her about five years after they were married. His physical abuse of her consisted of frequent assaults that included slapping, punching and kicking her, striking her with various objects, and throwing glasses, beer bottles and other objects at her. The defendant described other specific incidents of abuse, such as her husband putting her cigarettes out on her, throwing hot coffee on her, breaking glass against her face and crushing food on her face. Although the defendant did not present evidence of ever having received medical treatment for any physical injuries inflicted by her husband, she displayed several scars about her face which she attributed to her husband's assaults.

The defendant's evidence also tended to show other indignities inflicted upon her by her husband. Her evidence tended to show that her husband did not work and forced her to make money by prostitution, and that he made humor of that fact to family and friends. He would beat her if she resisted going out to prostitute herself or if he was unsatisfied with the amounts of money she made. He routinely called the defendant "dog," "bitch" and "whore," and on a few occasions made her eat pet food out of the pets' bowls and bark like a dog. He often made her sleep on the floor. At times, he deprived her of food and refused to let her get food for the family. During those years of abuse, the defendant's husband threatened numerous times to kill her and to maim her in various ways.

The defendant said her husband's abuse occurred only when he was intoxicated, but that he would not give up drinking. She said she and her husband "got along very well when he was sober," and that he was "a good guy" when he was not drunk. She had accompanied her husband to the local mental health center for sporadic counseling sessions for his problem, but he continued to drink.

In the early morning hours on the day before his death, the defendant's husband, who was intoxicated, went to a rest area off I-85 near Kings Mountain where the defendant was engaging in prostitution and assaulted her. While driving home, he was stopped by a patrolman and jailed on a charge of driving while impaired. After the defendant's mother got him out of jail at the defendant's request later that morning, he resumed his drinking and abuse of the defendant.

The defendant's evidence also tended to show that her husband seemed angrier than ever after he was released from jail and that his abuse of the defendant was more frequent. That evening, sheriff's deputies were called to the Norman residence, and the defendant complained that her husband had been beating her all day and she could not take it anymore. The defendant was advised to file a complaint, but she said she was afraid her husband would kill her if she had him arrested. The deputies told her they needed a warrant before they could arrest her husband, and they left the scene.

The deputies were called back less than an hour later after the defendant had taken a bottle of pills. The defendant's husband cursed her and called her names as she was attended by paramedics, and he told them to let her die. A sheriff's deputy finally chased him back into his house as the defendant was put into an ambulance. The defendant's stomach was pumped at the local hospital, and she was sent home with her mother.

While in the hospital, the defendant was visited by a therapist with whom she discussed filing charges against her husband and having him committed for treatment. Before the therapist left, the defendant agreed to go to the mental health center the next day to discuss those possibilities. The therapist testified at trial that the defendant seemed depressed in the hospital, and that she expressed considerable anger toward her husband. He

testified that the defendant threatened a number of times that night to kill her husband and that she said she should kill him "because of the things he had done to her."

The next day, the day she shot her husband, the defendant went to the mental health center to talk about charges and possible commitment, and she confronted her husband with that possibility. She testified that she told her husband later that day: "J. T., straighten up. Quit drinking. I'm going to have you committed to help you." She said her husband then told her he would "see them coming" and would cut her throat before they got to him.

The defendant also went to the social services office that day to seek welfare benefits, but her husband followed her there, interrupted her interview and made her go home with him. He continued his abuse of her, threatening to kill and to maim her, slapping her, kicking her, and throwing objects at her. At one point, he took her cigarette and put it out on her, causing a small burn on her upper torso. He would not let her eat or bring food into the house for their children.

That evening, the defendant and her husband went into their bedroom to lie down, and he called her a "dog" and made her lie on the floor when he lay down on the bed. Their daughter brought in her baby to leave with the defendant, and the defendant's husband agreed to let her baby-sit. After the defendant's husband fell asleep, the baby started crying and the defendant took it to her mother's house so it would not wake up her husband. She returned shortly with the pistol and killed her husband.

The defendant testified at trial that she was too afraid of her husband to press charges against him or to leave him. She said that she had temporarily left their home on several previous occasions, but he had always found her, brought her home and beaten her. Asked why she killed her husband, the defendant replied: "Because I was scared of him and I knowed when he woke up, it was going to be the same thing, and I was scared when he took me to the truck stop that night it was going to be worse than he had ever been. I just couldn't take it no more. There ain't no way, even if it means going to prison. It's better than living in that. That's worse hell than anything."

The defendant and other witnesses testified that for years her husband had frequently threatened to kill her and to maim her. When asked if she believed those threats, the defendant replied: "Yes. I believed him; he would, he would kill me if he got a chance. If he thought he wouldn't a had to went to jail, he would a done it."

Two expert witnesses in forensic psychology and psychiatry who examined the defendant after the shooting, Dr. William Tyson and Dr. Robert Rollins, testified that the defendant fit the profile of battered wife syndrome. This condition, they testified, is characterized by such abuse and degradation that the battered wife comes to believe she is unable to help herself and cannot expect help from anyone else. She believes that she cannot escape the complete control of her husband and that he is invulnerable to law enforcement and other sources of help.

Dr. Tyson, a psychologist, was asked his opinion as to whether, on 12 June 1985, "it appeared reasonably necessary for Judy Norman to shoot J. T. Norman?" He replied: "I believe that . . . Mrs. Norman believed herself to be doomed . . . to a life of the worst kind of torture and abuse, degradation that she had experienced over the years in a progressive way; that it would only get worse, and that death was inevitable . . . ." Dr. Tyson later added: "I think Judy Norman felt that she had no choice, both in the protection of herself and her family, but to engage, exhibit deadly force against Mr. Norman, and that in so doing, she was sacrificing herself, both for herself and for her family."

Dr. Rollins, who was the defendant's attending physician at Dorothea Dix Hospital when she was sent there for evaluation, testified that in his opinion the defendant was a typical abused spouse and that "[s]he saw herself as powerless to deal with the situation, that there was no alternative, no way she could escape it." Dr. Rollins was asked his opinion as to whether "on June 12th, 1985, it appeared reasonably necessary that Judy Norman would take the life of J. T. Norman?" Dr. Rollins replied that in his opinion, "that course of action did appear necessary to Mrs. Norman."

Based on the evidence that the defendant exhibited battered wife syndrome, that she believed she could not escape her husband nor expect help from others, that her husband had threat-

ened her, and that her .husband's abuse of her had worsened in the two days preceding his death, the Court of Appeals concluded that a jury reasonably could have found that her killing of her husband was justified as an act of perfect self-defense. The Court of Appeals reasoned that the nature of battered wife syndrome is such that a jury could not be precluded from finding the defendant killed her husband lawfully in perfect self-defense, even though he was asleep when she killed him. We disagree.

The right to kill in self-defense is based on the necessity, real or reasonably apparent, of killing an unlawful aggressor to save oneself from *imminent* death or great bodily harm at his hands. *State v. Gappins*, 320 N.C. 64, 357 S.E. 2d 654 (1987). Our law has recognized that self-preservation under such circumstances springs from a primal impulse and is an inherent right of natural law. *State v. Holland*, 193 N.C. 713, 718, 138 S.E. 8, 10 (1927).

In North Carolina, a defendant is entitled to have the jury consider acquittal by reason of *perfect* self-defense when the evidence, viewed in the light most favorable to the defendant, tends to show that at the time of the killing it appeared to the defendant and she believed it to be necessary to kill the decedent to save herself from imminent death or great bodily harm. *State v. Gappins*, 320 N.C. at 71, 357 S.E. 2d at 659. That belief must be reasonable, however, in that the circumstances as they appeared to the defendant would create such a belief in the mind of a person of ordinary firmness. *Id.* Further, the defendant must not have been the initial aggressor provoking the fatal confrontation. *Id.* A killing in the proper exercise of the right of *perfect* self-defense is always completely justified in law and constitutes no legal wrong.

Our law also recognizes an *imperfect* right of self-defense in certain circumstances, including, for example, when the defendant is the initial aggressor, but without intent to kill or to seriously injure the decedent, and the decedent escalates the confrontation to a point where it reasonably appears to the defendant to be necessary to kill the decedent to save herself from imminent death or great bodily harm. *State v. Mize*, 316 N.C. 48, 340 S.E. 2d 439 (1986); *State v. Wilson*, 304 N.C. 689, 285 S.E. 2d 804 (1982). Although the culpability of a defendant who kills in the exercise of *imperfect* self-defense is reduced, such a defendant is *not*

*justified* in the killing so as to be entitled to acquittal, but is guilty at least of voluntary manslaughter. *State v. Mize*, 316 N.C. at 52, 340 S.E. 2d at 441.

The defendant in the present case was not entitled to a jury instruction on either perfect or imperfect self-defense. The trial court was not required to instruct on *either* form of self-defense unless evidence was introduced tending to show that at the time of the killing the defendant reasonably believed herself to be confronted by circumstances which necessitated her killing her husband to save herself from *imminent* death or great bodily harm. *Id.* No such evidence was introduced in this case, and it would have been error for the trial court to instruct the jury on *either* perfect or imperfect self-defense. *See State v. Gappins*, 320 N.C. 64, 73, 357 S.E. 2d 654, 660 (1987); *State v. Mize*, 316 N.C. 48, 53, 340 S.E. 2d 439, 442 (1986); *State v. Spaulding*, 298 N.C. 149, 157, 257 S.E. 2d 391, 396 (1979); *State v. Marshall*, 208 N.C. 127, 129, 179 S.E. 427, 428 (1935); *State v. Kidd*, 60 N.C. App. 140, 142, 298 S.E. 2d 406, 408 (1982), *disc. rev. denied*, 307 N.C. 700, 301 S.E. 2d 393 (1983); *State v. Dial*, 38 N.C. App. 529, 531, 248 S.E. 2d 366, 367 (1978); 40 C.J.S. *Homicide* § 123(b) (1944).

The jury found the defendant guilty only of voluntary manslaughter in the present case. As we have indicated, an instruction on imperfect self-defense would have entitled the defendant to nothing more, since one who kills in the exercise of imperfect self-defense is guilty at least of voluntary manslaughter. Therefore, even if it is assumed arguendo that the defendant was entitled to an instruction on imperfect self-defense — a notion we have specifically rejected — the failure to give such an instruction was harmless in this case. Accordingly, although we recognize that the imminence requirement applies to both types of self-defense for almost identical reasons, we limit our consideration in the remainder of this opinion to the issue of whether the trial court erred in failing to instruct the jury to consider acquittal on the ground that the killing was justified and, thus, lawful as an act of *perfect* self-defense.

The killing of another human being is the most extreme recourse to our inherent right of self-preservation and can be justified in law only by the utmost real or apparent necessity brought about by the decedent. For that reason, our law of self-defense

has required that a defendant claiming that a homicide was justified and, as a result, inherently lawful by reason of perfect self-defense must establish that she reasonably believed at the time of the killing she otherwise would have immediately suffered death or great bodily harm. Only if defendants are required to show that they killed due to a reasonable belief that death or great bodily harm was imminent can the justification for homicide remain clearly and firmly rooted in necessity. The imminence requirement ensures that deadly force will be used only where it is necessary as a last resort in the exercise of the inherent right of self-preservation. It also ensures that before a homicide is justified and, as a result, not a legal wrong, it will be reliably determined that the defendant reasonably believed that absent the use of deadly force, not only would an unlawful attack have occurred, but also that the attack would have caused death or great bodily harm. The law does not sanction the use of deadly force to repel simple assaults. *State v. Watkins*, 283 N.C. 504, 196 S.E. 2d 750 (1973).

The term "imminent," as used to describe such perceived threats of death or great bodily harm as will justify a homicide by reason of perfect self-defense, has been defined as "immediate danger, such as must be instantly met, such as cannot be guarded against by calling for the assistance of others or the protection of the law." Black's Law Dictionary 676 (5th ed. 1979). Our cases have sometimes used the phrase "about to suffer" interchangeably with "imminent" to describe the immediacy of threat that is required to justify killing in self-defense. *State v. Holland*, 193 N.C. 713, 718, 138 S.E. 8, 10 (1927).

The evidence in this case did not tend to show that the defendant reasonably believed that she was confronted by a threat of imminent death or great bodily harm. The evidence tended to show that no harm was "imminent" or about to happen to the defendant when she shot her husband. The uncontroverted evidence was that her husband had been asleep for some time when she walked to her mother's house, returned with the pistol, fixed the pistol after it jammed and then shot her husband three times in the back of the head. The defendant was not faced with an instantaneous choice between killing her husband or being killed or seriously injured. Instead, *all* of the evidence tended to show that the defendant had ample time and opportunity to resort to other

means of preventing further abuse by her husband. There was no action underway by the decedent from which the jury could have found that the defendant had reasonable grounds to believe either that a felonious assault was imminent or that it might result in her death or great bodily injury. Additionally, no such action by the decedent had been underway immediately prior to his falling asleep.

Faced with somewhat similar facts, we have previously held that a defendant who believed himself to be threatened by the decedent was not entitled to a jury instruction on either perfect or imperfect self-defense when it was the defendant who went to the decedent and initiated the final, fatal confrontation. *State v. Mize*, 316 N.C. 48, 340 S.E. 2d 439 (1986). In *Mize*, the decedent Joe McDonald was reported to be looking for the defendant George Mize to get revenge for Mize's alleged rape of McDonald's girl friend, which had exacerbated existing animosity between Mize and McDonald. After hiding from McDonald for most of the day, Mize finally went to McDonald's residence, woke him up and then shot and killed him. Mize claimed that he feared McDonald was going to kill him and that his killing of McDonald was in self-defense. Rejecting Mize's argument that his jury should have been instructed on self-defense, we stated:

> Here, although the victim had pursued defendant during the day approximately eight hours before the killing, defendant Mize was in no imminent danger while McDonald was at home asleep. When Mize went to McDonald's trailer with his shotgun, it was a new confrontation. Therefore, even if Mize believed it was necessary to kill McDonald to avoid his own imminent death, that belief was unreasonable.

316 N.C. at 53, 340 S.E. 2d at 442 (citations omitted). The same reasoning applies in the present case.

Additionally, the lack of any belief by the defendant — reasonable or otherwise — that she faced a threat of imminent death or great bodily harm from the drunk and sleeping victim in the present case was illustrated by the defendant and her own expert witnesses when testifying about her subjective assessment of her situation at the time of the killing. The psychologist and psychiatrist replied affirmatively when asked their opinions of whether killing her husband "appeared reasonably necessary" to the de-

fendant at the time of the homicide. That testimony spoke of no *imminent* threat nor of any fear by the defendant of death or great bodily harm, imminent or otherwise. Testimony in the form of a conclusion that a killing "appeared reasonably necessary" to a defendant does not tend to show all that must be shown to establish self-defense. More specifically, for a killing to be in self-defense, the perceived necessity must arise from a reasonable fear of imminent death or great bodily harm.

Dr. Tyson additionally testified that the defendant "believed herself to be doomed . . . to a life of the worst kind of torture and abuse, degradation that she had experienced over the years in a progressive way; that it would only get worse, and that death was inevitable." Such evidence of the defendant's speculative beliefs concerning her remote and indefinite future, while indicating she had felt generally threatened, did not tend to show that she killed in the belief—reasonable or otherwise—that her husband presented a threat of *imminent* death or great bodily harm. Under our law of self-defense, a defendant's subjective belief of what might be "inevitable" at some indefinite point in the future does not equate to what she believes to be "imminent." Dr. Tyson's opinion that the defendant believed it was necessary to kill her husband for "the protection of herself and her family" was similarly indefinite and devoid of time frame and did not tend to show a threat or fear of *imminent* harm.

The defendant testified that, "I knowed when he woke up, it was going to be the same thing, and I was scared when he took me to the truck stop that night it was going to be worse than he had ever been." She also testified, when asked if she believed her husband's threats: "Yes. . . . [H]e would kill me if he got a chance. If he thought he wouldn't a had to went to jail, he would a done it." Testimony about such indefinite fears concerning what her sleeping husband might do at some time in the future did not tend to establish a fear—reasonable or otherwise—of *imminent death or great bodily harm* at the time of the killing.

We are not persuaded by the reasoning of our Court of Appeals in this case that when there is evidence of battered wife syndrome, neither an actual attack nor threat of attack by the husband at the moment the wife uses deadly force is required to justify the wife's killing of him in perfect self-defense. The Court

of Appeals concluded that to impose such requirements would ignore the "learned helplessness," meekness and other realities of battered wife syndrome and would effectively preclude such women from exercising their right of self-defense. 89 N.C. App. 384, 392-393, 366 S.E. 2d 586, 591-592 (1988). *See* Mather, *The Skeleton in the Closet: The Battered Woman Syndrome, Self-Defense, and Expert Testimony*, 39 Mercer L. Rev. 545 (1988); Eber, *The Battered Wife's Dilemma: To Kill Or To Be Killed*, 32 Hastings L.J. 895 (1981). Other jurisdictions which have addressed this question under similar facts are divided in their views, and we can discern no clear majority position on facts closely similar to those of this case. *Compare, e.g., Commonwealth v. Grove*, 363 Pa. Super. 328, 526 A. 2d 369, *appeal denied*, 517 Pa. 630, 539 A. 2d 810 (1987) (abused wife who killed her sleeping husband not entitled to self-defense instruction as no immediate threat was posed by the decedent), *with State v. Gallegos*, 104 N.M. 247, 719 P. 2d 1268 (1986) (abused wife could claim self-defense where she walked into bedroom with gun and killed husband who was awake but lying on the bed).

The reasoning of our Court of Appeals in this case proposes to change the established law of self-defense by giving the term "imminent" a meaning substantially more indefinite and all-encompassing than its present meaning. This would result in a substantial relaxation of the requirement of real or apparent necessity to justify homicide. Such reasoning proposes justifying the taking of human life not upon the reasonable belief it is necessary to prevent death or great bodily harm—which the imminence requirement ensures—but upon purely subjective speculation that the decedent probably would present a threat to life at a future time and that the defendant would not be able to avoid the predicted threat.

The Court of Appeals suggests that such speculation would have been particularly reliable in the present case because the jury, based on the evidence of the decedent's intensified abuse during the thirty-six hours preceding his death, could have found that the decedent's passive state at the time of his death was "but a momentary hiatus in a continuous reign of terror by the decedent [and] the defendant merely took advantage of her first opportunity to protect herself." 89 N.C. App. at 394, 366 S.E. 2d at 592. Requiring jury instructions on perfect self-defense in such

situations, however, would still tend to make opportune homicide lawful as a result of mere subjective predictions of indefinite future assaults and circumstances. Such predictions of future assaults to justify the defendant's use of deadly force in this case would be entirely speculative, because there was no evidence that her husband had ever inflicted any harm upon her that approached life-threatening injury, even during the "reign of terror." It is far from clear in the defendant's poignant evidence that any abuse by the decedent had ever involved the degree of physical threat required to justify the defendant in using deadly force, even when those threats were imminent. The use of deadly force in self-defense to prevent harm other than death or great bodily harm is excessive as a matter of law. *State v. Hunter*, 315 N.C. 371, 338 S.E. 2d 99 (1986).

As we have stated, stretching the law of self-defense to fit the facts of this case would require changing the "imminent death or great bodily harm" requirement to something substantially more indefinite than previously required and would weaken our assurances that justification for the taking of human life remains firmly rooted in real or apparent necessity. That result in principle could not be limited to a few cases decided on evidence as poignant as this. The relaxed requirements for perfect self-defense proposed by our Court of Appeals would tend to categorically legalize the opportune killing of abusive husbands by their wives solely on the basis of the wives' testimony concerning their subjective speculation as to the probability of future felonious assaults by their husbands. Homicidal self-help would then become a lawful solution, and perhaps the easiest and most effective solution, to this problem. *See generally* Rosen, *The Excuse of Self-Defense: Correcting A Historical Accident on Behalf of Battered Women Who Kill*, 36 Am. U.L. Rev. 11 (1986) (advocating changing the basis of self-defense acquittals to *excuse* rather than *justification*, so that *excusing* battered women's killing of their husbands under circumstances not fitting within the traditional requirements of self-defense would not be seen as *justifying* and therefore encouraging such self-help killing); Mitchell, *Does Wife Abuse Justify Homicide?*, 24 Wayne L. Rev. 1705 (1978) (advocating institutional rather than self-help solutions to wife abuse and citing case studies at the trial level where traditional defenses to homicide appeared stretched to accommodate poignant

State v. Norman

facts, resulting in justifications of some killings which appeared to be motivated by revenge rather than protection from death or great bodily harm). It has even been suggested that the relaxed requirements of self-defense found in what is often called the "battered woman's defense" could be extended in principle to *any type of case* in which a defendant testified that he or she subjectively believed that killing was necessary and proportionate to any perceived threat. Rosen, *The Excuse of Self-Defense: Correcting A Historical Accident on Behalf of Battered Women Who Kill*, 36 Am. U.L. Rev. 11, 44 (1986).

In conclusion, we decline to expand our law of self-defense beyond the limits of immediacy and necessity which have heretofore provided an appropriately narrow but firm basis upon which homicide may be justified and, thus, lawful by reason of perfect self-defense or upon which a defendant's culpability may be reduced by reason of imperfect self-defense. As we have shown, the evidence in this case did not entitle the defendant to jury instructions on either perfect or imperfect self-defense.

For the foregoing reasons, we conclude that the defendant's conviction for voluntary manslaughter and the trial court's judgment sentencing her to a six-year term of imprisonment were without error. Therefore, we must reverse the decision of the Court of Appeals which awarded the defendant a new trial.

Reversed.

Justice MARTIN dissenting.

At the outset it is to be noted that the peril of fabricated evidence is not unique to the trials of battered wives who kill. The possibility of invented evidence arises in all cases in which a party is seeking the benefit of self-defense. Moreover, in this case there were a number of witnesses other than defendant who testified as to the actual presence of circumstances supporting a claim of self-defense. This record contains no reasonable basis to attack the credibility of evidence for the defendant.

Likewise, the difficulty of rebutting defendant's evidence because the only other witness to many of the events is deceased is not unique to this type of case. This situation is also commonplace in cases in which self-defense is raised, although, again,

in the case sub judice there was more than one surviving witness to such events. In considering the argument that the state is faced with a difficult burden in attempting to rebut evidence of which defendant is the only surviving witness, one must not overlook the law: the burden is always on the state to prove that the killing was intentional beyond a reasonable doubt. "Defendant may always rest ultimately on the weakness of the state's case and the state's failure to carry its burden of proof." *State v. Patterson*, 297 N.C. 247, 256, 254 S.E. 2d 604, 610 (1979).

At the heart of the majority's reasoning is its unsubstantiated concern that to find that the evidence presented by defendant would support an instruction on self-defense would "expand our law of self-defense beyond the limits of immediacy and necessity." Defendant does not seek to expand or relax the requirements of self-defense and thereby "legalize the opportune killing of allegedly abusive husbands by their wives," as the majority overstates. Rather, defendant contends that the evidence as gauged by the existing laws of self-defense is sufficient to require the submission of a self-defense instruction to the jury. The proper issue for this Court is to determine whether the evidence, viewed in the light most favorable to the defendant, was sufficient to require the trial court to instruct on the law of self-defense. I conclude that it was.

In every jury trial, it is the duty of the court to charge the jury on all substantial features of the case arising on the evidence, whether or not such instructions have been requested. *See State v. Dooley*, 285 N.C. 158, 203 S.E. 2d 815 (1974). All defenses presented by the defendant's evidence are substantial features of the case, even if that evidence contains discrepancies or is contradicted by evidence from the state. *Id.* This rule reflects the principle in our jurisprudence that it is the jury, not the judge, that weighs the evidence.

A defendant is entitled to an instruction on self-defense when there is evidence, viewed in the light most favorable to the defendant, that these four elements existed at the time of the killing:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Gappins*, 320 N.C. 64, 71, 357 S.E. 2d 654, 659 (1987). *See also State v. McCray*, 312 N.C. 519, 324 S.E. 2d 606 (1985) (to be entitled to an instruction on self-defense defendant must produce evidence tending to show he was free from fault and it was necessary or reasonably appeared to be necessary to kill in order to protect himself from great bodily harm or death). *See generally State v. Wallace*, 309 N.C. 141, 305 S.E. 2d 548 (1983); *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982); *State v. Wilson*, 304 N.C. 689, 285 S.E. 2d 804 (1982); *State v. Norris*, 303 N.C. 526, 279 S.E. 2d 570 (1981); *State v. Potter*, 295 N.C. 126, 244 S.E. 2d 397 (1978) (cases setting out these elements as requisites of proof of self-defense). The first element requires that there be evidence that the defendant believed it was necessary to kill in order to protect herself from serious bodily harm or death; the second requires that the circumstances as defendant perceived them were sufficient to create such a belief in the mind of a person of ordinary firmness. Both elements were supported by evidence at defendant's trial.

Evidence presented by defendant described a twenty-year history of beatings and other dehumanizing and degrading treatment by her husband. In his expert testimony a clinical psychologist concluded that defendant fit "and exceed[ed]" the profile of an abused or battered spouse, analogizing this treatment to the dehumanization process suffered by prisoners of war under the Nazis during the Second World War and the brainwashing techniques of the Korean War. The psychologist described the defendant as a woman incarcerated by abuse, by fear, and by her conviction that her husband was invincible and inescapable:

> Mrs. Norman didn't leave because she believed, fully believed that escape was totally impossible. There was no place to go. He, she had left before; he had come and gotten her. She had gone to the Department of Social Services. He had come and gotten her. The law, she believed the law could not protect her; no one could protect her, and I must admit, looking over the records, that there was nothing done that would contradict that belief. She fully believed that he was invulnerable to the law and to all social agencies that were available; that nobody could withstand his power. As a result, there was no such thing as escape.

When asked if he had an opinion whether it appeared reasonably necessary for Judy Norman to shoot her husband, this witness responded:

> Yes. . . . I believe that in examining the facts of this case and examining the psychological data, that Mrs. Norman believed herself to be doomed . . . to a life of the worst kind of torture and abuse, degradation that she had experienced over the years in a progressive way; that it would only get worse, and that death was inevitable; death of herself, which was not such, I don't think was such an issue for her, as she had attempted to commit suicide, and in her continuing conviction of J. T. Norman's power over her, and even failed at that form of escape. I believe she also came to the point of beginning to fear for family members and her children, that were she to commit suicide that the abuse and the treatment that was heaped on her would be transferred onto them.

This testimony describes defendant's perception of circumstances in which she was held hostage to her husband's abuse for two decades and which ultimately compelled her to kill him. This testimony alone is evidence amply indicating the first two elements required for entitlement to an instruction on self-defense.

In addition to the testimony of the clinical psychologist, defendant presented the testimony of witnesses who had actually seen defendant's husband abuse her. These witnesses described circumstances that caused not only defendant to believe escape was impossible, but that also convinced *them* of its impossibility. Defendant's isolation and helplessness were evident in testimony that her family was intimidated by her husband into acquiescing

in his torture of her. Witnesses also described defendant's experience with social service agencies and the law, which had contributed to her sense of futility and abandonment through the inefficacy of their protection and the strength of her husband's wrath when they failed. Where torture appears interminable and escape impossible, the belief that only the death of the oppressor can provide relief is reasonable in the mind of a person of ordinary firmness, let alone in the mind of the defendant, who, like a prisoner of war of some years, has been deprived of her humanity and is held hostage by fear.

In *State v. Mize*, 316 N.C. 48, 53, 340 S.E. 2d 439, 442 (1986), this Court noted that if the defendant was in "no imminent danger" at the time of the killing, then his belief that it was necessary to kill the man who had pursued him eight hours before was unreasonable. The second element of self-defense was therefore not satisfied. In the context of the doctrine of self-defense, the definition of "imminent" must be informed by the defendant's perceptions. It is not bounded merely by measurable time, but by all of the facts and circumstances. Its meaning depends upon the assessment of the facts by one of "ordinary firmness" with regard to whether the defendant's perception of impending death or injury was so pressing as to render reasonable her belief that it was necessary to kill.

Evidence presented in the case sub judice revealed no letup of tension or fear, no moment in which the defendant felt released from impending serious harm, even while the decedent slept. This, in fact, is a state of mind common to the battered spouse, and one that dramatically distinguishes Judy Norman's belief in the imminence of serious harm from that asserted by the defendant in *Mize*. Psychologists have observed and commentators have described a "constant state of fear" brought on by the cyclical nature of battering as well as the battered spouse's perception that her abuser is both "omnipotent and unstoppable." *See* Comment, *The Admissibility of Expert Testimony on the Battered Woman Syndrome in Support of a Claim of Self-Defense*, 15 Conn. L. Rev. 121, 131 (1982). Constant fear means a perpetual anticipation of the next blow, a perpetual expectation that the next blow will kill. "[T]he battered wife is constantly in a heightened state of terror because she is certain that one day her husband will kill her during the course of a beating. . . . Thus from the perspec-

tive of the battered wife, the danger is constantly 'immediate.' "
Eber, *The Battered Wife's Dilemma: To Kill or To Be Killed*, 32
Hastings L.J. 895, 928-29 (1981). For the battered wife, if there is
no escape, if there is no window of relief or momentary sense of
safety, then the next attack, which could be the fatal one, is immi-
nent. In the context of the doctrine of self-defense, "imminent" is
a term the meaning of which must be grasped from the defend-
ant's point of view. Properly stated, the second prong of the ques-
tion is not whether the threat was *in fact* imminent, but whether
defendant's belief in the impending nature of the threat, given
the circumstances as she saw them, was reasonable in the mind of
a person of ordinary firmness.[1]

Defendant's intense fear, based on her belief that her hus-
band intended not only to maim or deface her, as he had in the
past, but to kill her, was evident in the testimony of witnesses
who recounted events of the last three days of the decedent's life.
This testimony could have led a juror to conclude that defendant
reasonably perceived a threat to her life as "imminent," even
while her husband slept. Over these three days, her husband's
anger was exhibited in an unprecedented crescendo of violence.
The evidence showed defendant's fear and sense of hopelessness
similarly intensifying, leading to an unsuccessful attempt to
escape through suicide and culminating in her belief that escape
would be possible only through her husband's death.

Defendant testified that on 10 June, two days before her hus-
band's death, he had again forced her to go to a rest stop near
Kings Mountain to make money by prostitution. Her daughter
Phyllis and Phyllis's boyfriend Mark Navarra accompanied her on
this occasion because, defendant said, whenever her husband took
her there, he would beat her. Phyllis corroborated this account.
She testified that her father had arrived some time later and had
begun beating her mother, asking how much money she had. De-
fendant said they all then drove off. Shortly afterwards an officer
arrested defendant's husband for driving under the influence. He

---

1. This interpretation of the meaning of "imminent" is reflected in the Com-
ments to the Model Penal Code: "The actor must believe that his defensive action
is immediately necessary and the unlawful force against which he defends must be
force that he apprehends will be used on the present occasion, but he need not ap
prehend that it will be immediately used." Model Penal Code § 3.04 comment (ALI
1985).

spent the night in jail and was released the next morning on bond paid by defendant's mother.

Defendant testified that her husband was argumentative and abusive all through the next day, 11 June. Mark Navarra testified that at one point defendant's husband threw a sandwich that defendant had made for him on the floor. She made another; he threw it on the floor, as well, then insisted she prepare one without touching it. Defendant's husband had then taken the third sandwich, which defendant had wrapped in paper towels, and smeared it on her face. Both Navarra and Phyllis testified that they had later watched defendant's husband seize defendant's cigarette and put it out on her neck, the scars from which defendant displayed to the jury.

A police officer testified that he arrived at defendant's home at 8:00 that evening in response to a call reporting a domestic quarrel. Defendant, whose face was bruised, was crying, and she told the officer that her husband had beaten her all day long and that she could not take it any longer. The officer told her that he could do nothing for her unless she took out a warrant on her husband. She responded that if she did, her husband would kill her. The officer left but was soon radioed to return because defendant had taken an overdose of pills. The officer testified that defendant's husband was interfering with ambulance attendants, saying "Let the bitch die." When he refused to respond to the officer's warning that if he continued to hinder the attendants, he would be arrested, the officer was compelled to chase him into the house.

Defendant's mother testified that her son-in-law had reacted to the discovery that her daughter had taken the pills with cursing and obscenities and threats such as, "Now, you're going to pay for taking those pills," and "I'll kill you, your mother and your grandmother." His rage was such that defendant's mother feared he might kill the whole family, and knowing defendant's sister had a gun in her purse, she took the gun and placed it in her own.

Defendant was taken to the hospital, treated, and released at 2:30 a.m. She spent the remainder of the night at her grandmother's house. Defendant testified that the next day, 12 June, she felt dazed all day long. She went in the morning to the county mental

health center for guidance on domestic abuse. When she returned home, she tried to talk to her husband, telling him to "straighten up. Quit drinking. . . . I'm going to have you committed to help you." Her husband responded, "If you do, I'll see them coming and before they get here, I'll cut your throat."

Later, her husband made her drive him and his friend to Spartanburg to pick up the friend's paycheck. On the way, the friend testified, defendant's husband "started slapping on her" when she was following a truck too closely, and he periodically poured his beer into a glass, then reached over and poured it on defendant's head. At one point defendant's husband lay down on the front seat with his head on the arm rest, "like he was going to go to sleep," and kicked defendant, who was still driving, in the side of the head.

Mark Navarra testified that in the year and a half he had lived with the Normans, he had never seen defendant's husband madder than he was on 12 June, opining that it was the DUI arrest two days before that had ignited J. T.'s fury. Phyllis testified that her father had beaten her mother "all day long." She testified that this was the third day defendant's husband had forbidden her to eat any food. Phyllis said defendant's family tried to get her to eat, but defendant, fearing a beating, would not. Although Phyllis's grandmother had sent over a bag of groceries that day, defendant's husband had made defendant put them back in the bag and would not let anyone eat them.

Early in the evening of 12 June, defendant's husband told defendant, "Let's go to bed." Phyllis testified that although there were two beds in the room, her father had forbidden defendant from sleeping on either. Instead, he had made her lie down on the concrete floor between the two beds, saying, "Dogs don't lay in the bed. They lay in the floor." Shortly afterward, defendant testified, Phyllis came in and asked her father if defendant could take care of her baby while she went to the store. He assented and eventually went to sleep. Defendant was still on the floor, the baby on the small bed. The baby started to cry and defendant "snuck up and took him out there to [her] mother's [house]." She asked her mother to watch the baby, then asked if her mother had anything for headache, as her head was "busting." Her mother responded that she had some pain pills in her purse. De-

fendant went in to get the pills, "and the gun was in there, and I don't know, I just seen the gun, and I took it out, and I went back there and shot him."

From this evidence of the exacerbated nature of the last three days of twenty years of provocation, a juror could conclude that defendant believed that her husband's threats to her life were viable, that serious bodily harm was imminent, and that it was necessary to kill her husband to escape that harm. And from this evidence a juror could find defendant's belief in the necessity to kill her husband not merely reasonable but compelling.

The third element for entitlement to an instruction on self-defense requires that there be evidence that the defendant was not the aggressor in bringing on the affray. If the defendant was the aggressor and killed with murderous intent, that is, the intent to kill or inflict serious bodily harm, then she is not entitled to an instruction on self-defense. *State v. Mize*, 316 N.C. 48, 340 S.E. 2d 439. A hiatus between provocation by the decedent and the killing can mark the initiation of a new confrontation between the defendant and the decedent, such that the defendant's earlier perception of imminent danger no longer appears reasonable and the defendant becomes the aggressor. For example, in *Mize*, the defendant, who had been told the day before that the decedent was "out to get" him, went to the decedent's trailer with a shotgun, knocked on the front door, and hid under the steps when the decedent opened the door and asked who was there. Defendant then went to the back door, knocked again, and shot the decedent. When the defendant went with his shotgun to the decedent's trailer, this Court said, it was a new confrontation, and if the defendant still believed that it was necessary to kill the decedent to avoid his own imminent death, that belief was unreasonable.

Where the defendant is a battered wife, there is no analogue to the victim-turned-aggressor, who, as in *Mize*, turns the tables on the decedent in a fresh confrontation. Where the defendant is a battered wife, the affray out of which the killing arises can be a continuing assault. There was evidence before the jury that it had not been defendant but her husband who had initiated "the affray," which the jury could have regarded as lasting twenty years, three days, or any number of hours preceding his death. And there was evidence from which the jury could infer that in

defendant's mind the affray reached beyond the moment at which her husband fell asleep. Like the ongoing threats of death or great bodily harm, which she might reasonably have perceived as imminent, her husband continued to be the aggressor and she the victim.

Finally, the fourth element of self-defense poses the question of whether there was any evidence tending to show that the force used by defendant to repel her husband was not excessive, that is, more than reasonably appeared to be necessary under the circumstances. This question is answered in part by abundant testimony describing defendant's immobilization by fear caused by abuse by her husband. Three witnesses, including the decedent's best friend, all recounted incidents in which defendant passively accepted beating, kicks, commands, or humiliating affronts without striking back. From such evidence that she was paralyzed by her husband's presence, a jury could infer that it reasonably appeared to defendant to be necessary to kill her husband in order ultimately to protect herself from the death he had threatened and from severe bodily injury, a foretaste of which she had already experienced.

In *State v. Wingler*, 184 N.C. 747, 115 S.E. 59 (1922), in which the defendant was found guilty for the murder of his wife, Justice (later Chief Justice) Stacy recognized the pain and oppression under which a woman suffers at the hands of an abusive husband: "The supreme tragedy of life is the immolation of woman. With a heavy hand, nature exacts from her a high tax of blood and tears." *Id.* at 751, 115 S.E. at 61. By his barbaric conduct over the course of twenty years, J. T. Norman reduced the quality of the defendant's life to such an abysmal state that, given the opportunity to do so, the jury might well have found that she was justified in acting in self-defense for the preservation of her tragic life.

It is to be remembered that defendant does not have the burden of persuasion as to self-defense; the burden remains with the state to prove beyond a reasonable doubt that defendant intentionally killed decedent without excuse or justification. *See State v. Mash*, 323 N.C. 339, 346, 372 S.E. 2d 532, 537 (1988) (the state must satisfy the jury beyond a reasonable doubt that, despite evidence of intoxication, defendant did form a deliberate and

premeditated intent to kill). If the evidence in support of self-defense is sufficient to create a reasonable doubt in the mind of a rational juror whether the state has proved an intentional killing without justification or excuse, self-defense must be submitted to the jury. This is such a case.

